NSAHLAI LAW FIRM
EMMANUEL NSAHLAI, SBN (207588)
Email: nsahlai.e@nsahlailawfirm.com
3460 WILSHIRE BLVD, STE 1220
LOS ANGELES, CA 90010
Tel:   (213) 674-4181
Fax:   (213) 738-0828

Attorney for Plaintiffs,
Nyah Tchami William; Nana Bamen Ngnangna Eugenie;
Kamga Justin; Motsebo;
Mendefo Youmeni Jean Jules; Madame Mendefo Fridoline;
Fowouo Richard;
John 1 Doe, Jane 1 Doe: People of Jakiri Sub-Division;
John 2 Doe, Jane 2 Doe: Inhabitants of Yaounde;
John 3 Doe, Jane 3 Doe: Inhabitants of Ngoa-Ekelle;
John 4 Doe, Jane 4 Doe: Inhabitants of Bamenda;
Business Group 1: Association of Fisherman;
Business Group 2: Association of Merchants in Electrical Goods;
Business Group 3: Association of Construction workers;
Business Group 4: Association of Milk Factories; and
Business Group 5: Association of Food Market

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NYAH TCHAMI WILLIAM; NANA BAMEN NGNANGNA EUGENIE; KAMGA JUSTIN; MOTSEBO; MENDEFO YOUMENI JEAN JULES; MADAME MENDEFO FRIDOLINE; FOWOUO RICHARD; JOHN 1 DOE, JANE 1 DOE: PEOPLE OF JAKIRI SUB-DIVISION; JOHN 2 DOE, JANE 2 DOE: INHABITANTS OF YAOUNDE; JOHN 3 DOE, JANE 3 DOE: INHABITANTS OF NGOA-EKELLE; JOHN 4 DOE, JANE 4 DOE: INHABITANTS OF BAMENDA; | § § § § § § § § § § § § § § § |

**Case No.: CV 13-02326 MRP (PLAx)**

**SECOND AMENDED COMPLAINT FOR DAMAGES**

1. CRUEL, INHUMAN, OR DEGRADING TREATMENT
2. BREACH OF THIRD PARTY CONTRACT
3. WRONGFUL DEATH
4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
5. NEGLIGENT INFLICTION OF

-i-

| | | |
|---|---|---|
| 1 | BUSINESS GROUP 1: | § |
| 2 | ASSOCIATION OF FISHERMAN; | § |
| | BUSINESS GROUP 2: | § |
| 3 | ASSOCIATION OF MERCHANTS IN | § |
| | ELECTRICAL GOODS; | § |
| 4 | BUSINESS GROUP 3: | § |
| 5 | ASSOCIATION OF | § |
| | CONSTRUCTION WORKERS; | § |
| 6 | BUSINESS GROUP 4: | § |
| 7 | ASSOCIATION OF MILK | § |
| | FACTORIES; AND | § |
| 8 | BUSINESS GROUP 5: | § |
| 9 | ASSOCIATION OF FOOD MARKET, | § |
| | Plaintiffs, | § |
| 10 | | § |
| | | § |
| 11 | vs. | § |
| | | § |
| 12 | THE AES CORPORATION, a | § |
| 13 | Delaware Corporation; AES SONEL, | § |
| | business entity in Cameroon; ACTIS | § |
| 14 | CAPITAL LLP, a private equity firm. | § |
| 15 | Defendants. | § |

EMOTIONAL DISTRESS
6. NEGLIGENCE/NEGLIGENCE PER SE
7. CIVIL CONSPIRACY
8. LOSS OF CONSORTIUM
9. NEGLIGENT MISREPRESENTATION
10. INTENTIONAL MISREPRESENTATION

Filed: April 1, 2013
HEARING DATE:
Judge: Hon. Philip S. Gutierrez

**DEMAND FOR JURY TRIAL**

Second Amended Complaint for Damages          Case .No. CV 13-02326 MRP (PLAx)
*Nyah Tchami William, et al. v. AES*

On information and belief, Plaintiffs, by their attorney, allege as follows:

## INTRODUCTION

1.     As an initial matter, this Second Amended Complaint should be read in conjunction with the Motion to Transfer Venue as the facts alleged here are intended to satisfy the jurisdictional, substantive, and other procedural requirements of the District Court in Arlington, Virginia, where plaintiffs seek transfer of this case.

2.     This case arises as a result of series of power or electrical supply failure, short circuits, voltage fluctuation, which caused numerous death, misery, regular power outages, and substantial economic losses, due to power failures between 2001 to the present. In each, AES Corporation ("AES CORPORATION"), a Delaware corporation, is the parent company in the US, directly and/or through its wholly owned subsidiary corporation, AES Sonel, Cameroon (hereinafter "AES SONEL") entered into a contract with the Cameroon government to supply electric power. AES Corporation is headquartered in Arlington, VA, U.S.A.

3.     Without access to power or electricity service, Cameroon consumers in general, and plaintiffs in particular, are deprived of the most basic of human rights and of economic opportunities to improve their standard of living. People cannot access modern hospital services without electricity, or feel relief from sweltering heat. Food cannot be refrigerated and businesses cannot function. Further, Plaintiffs in particular rights to life, liberty and security is compromised. The lack of energy, living in darkness, creates and invites robberies and theft, leads to loss of lives, affects security. The deprivation of such basic human rights is without a doubt torture, cruel, inhuman or degrading treatment. The list of deprivation goes on.

4.     The deprivation of electricity and/or power services also deprives plaintiffs of human rights to rest and leisure; human rights of a social and international order of energy and/or power supply with which they may live as human beings; the human right to a standard of living adequate for the health and

-1-

well-being of himself and his family. Plaintiffs are not granted these rights and services due to defendants' actions: without power or electricity, they are unable to rest, obtain services, store food, live in security, and so on and forth.

5.      It appears sufficiently well settled, international-wide, that access to electricity affects people's right to work – it improves working conditions; right to education – lack of electricity reduces the ability of students to study after dark; right to health – it helps run medical equipment necessary for treatment; right to standard of living, it affects manufacturing, which in turn affects the economy. It is in this spiral that Cameroonians in general and plaintiffs specifically, find themselves in: deprivation of basic human rights.

6.      Recently, AES CORPORATION signed agreements to sell its electric generation and distribution businesses in Cameroon, i.e. AES SONEL to ACTIS CAPITAL LLP (a global pan-emerging market private equity firm) (hereinafter "ACTIS"), on or about November, 2013. It appears this sale was finalized on or about February 2014.   Hereinafter, Defendant, AES CORPORATION, AES SONEL, and ACTIS are collectively referred as Defendants.

7.      In Cameroon, the AES CORPORATION is involved in the generation, transmission, distribution, and sale of electricity through AES SONEL, an integrated utility, and two Independent Power Producers (IPP).[1]

8.      AES own 56% of AES SONEL[2] with the remaining 44% held by the Republic of Cameroon. AES SONEL is the only electricity provider in Cameroon. It is regulated by the Agence de Régulation de Secteur d'Electricité (ARSEL). AES SONEL operates and maintains 936 MW of generation, two interconnected transmission networks and distributes electricity to more than 800,000 primarily

---

[1] *See*, Page 48 of Form 10-K, AES CORPORATION filed with United States Securities And Exchange Commission; *Source:* http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MTczNjUyfENoaWWxkSUQ9LTF8VHlwZT0z&t=1
[2] Recently, AES CORPORATION has signed agreements to sell AES SONEL businesses in Cameroon to ACTIS

-2-

1   residential customers.  AES SONEL operates under a 20-year concession agreement
2   that was signed in July 2001.[3]

3       9.    In addition, AES CORPORATION is part owner and sole operator of
4   two IPPs; Dibamba Power Development Company ("DPDC"), with an 86 MW
5   heavy fuel oil plant, and Kribi Power Development Company ("KPDC"), with a 216
6   MW gas/light fuel oil plant, currently under commissioning. DPDC and KPDC have
7   the same ownership structure; 56% AES and 44% Republic of Cameroon. Contracts
8   at KPDC and DPDC are primarily capacity based with Government protections.
9   DPDC has a 20-year tolling agreement with AES SONEL and KPDC has a 20-year
10  PPA with AES SONEL and a 20-year gas supply agreement with the Government-
11  owned Societe Nationaledes Hydrocarbures ("SNH").[4]

12      10.    The power supply in Cameroon is solely generated, managed, and
13  operated by the AES SONEL and has monopoly in the business.  The AES SONEL
14  is dependent on the AES CORPORATION for the management and all major
15  activities necessary for the power generation, supply and regulation of the power
16  supply in Cameroon.  The business activities are solely handled by the AES SONEL
17  in Cameroon and Cameroon government or enforcing authorities in Cameroon do
18  not have control over the activities of the AES SONEL.  The frequent blackouts,
19  voltage fluctuation and short circuits witnessed in several towns across the
20  Cameroon have been blamed on AES SONEL.  The increasing number of deaths,
21  fire in the household, equipment and appliances malfunctioning, business losses, and
22  the damages are due to the frequent blackouts, voltage fluctuation and short circuits

23

24

25   [3] *See*, Page 48 of Form 10-K, AES CORPORATION filed with United States Securities And
     Exchange Commission; *Source*: http://phx.corporate-
26   ir.net/External.File?item=UGFyZW50SUQ9MTczNjUyfENoaWxkSUQ9LTF8VHlwZT0z&t=1
     [4] *See*, Page 48 of Form 10-K, AES CORPORATION filed with United States Securities And
27   Exchange Commission; *Source*: http://phx.corporate-
     ir.net/External.File?item=UGFyZW50SUQ9MTczNjUyfENoaWxkSUQ9LTF8VHlwZT0z&t=1
28

-3-

1  are increasing day by day due to the sub-standards AES adopted in the Cameroon in

2  supplying and regulating power supply.

3     11.    From August 2012 to March 2013, Cameroon recorded 8,337 power

4  cuts. There is no single day in Cameroon that the population goes without recording

5  a minimum of ten electricity cuts per day.  The damage is enormous. Businesses

6  have suffered.  The sudden return of electricity has resulted to fire outbreaks. Of late,

7  fire outbreak in some markets like Bamenda main market, Mokolo market in

8  Yaounde, Marche Congo in Douala markets etc. in Cameroon were as a result of

9  uncontrolled electricity supply.  Notwithstanding, some deaths have been recorded.

10  Recently, high tension cable burnt to death a herdsman and three of his cows in

11  Nkambe. Domestic users suffer intolerable discomfort. Household electronic

12  equipment suffers the most with high voltage or when electricity comes back. The

13  sad story is that when the power flows back on, the tension on the line is often vastly

14  over the 220 Volts limit, home appliances cannot support such high tensions and

15  often go up in flames when the power cut comes to an end. The best bakery of

16  Douala was lost to fire due to a power cut in February. Thousands of home

17  appliances are destroyed on daily basis but AES SONEL doesn't compensate

18  consumers for the destruction. The population is being rendered poorer and poorer.[5]

19     12.    The AES CORPORATION is a U.S. Corporation and "corporate

20  presence" in the United States is sufficient for a claim to "touch and concern" the

21  United States, when such corporation is actively and centrally involved in all the

22  decision of the AES SONEL, and share the profits from its subsidiaries including

23  AES SONEL; moreover the AES CORPORATION corporate citizenship in the

24  United States is also a factor to make it liable under the ATS. The human rights and

25

26

27  [5] Source http://www.camer.be/index1.php?art=26289&rub=30:27
    http://jplusplus.github.io/camcuts/

28                                          -4-

1  international law violations committed by U.S. citizens on foreign soil 'touch and

2  concern' the U.S. territory with 'sufficient force' to displace the *Kiobel* presumption.

3     13.   The AES CORPORATION is a holding company with no material

4  assets other than the stock of its subsidiaries. <u>All of the AES CORPORATION'S</u>

5  <u>revenue is generated through its subsidiaries</u>. Accordingly, almost all of The AES

6  CORPORATION'S cash flow is generated by the operating activities of its

7  subsidiaries. Therefore, the AES CORPORATION'S ability to make payments on its

8  indebtedness and to fund its other obligations is dependent not only on the ability of

9  its subsidiaries to generate cash, but also on the ability of the· subsidiaries to

10 distribute cash to it in the form of dividends, fees, interest, tax sharing, loans or

11 otherwise.[6]   AES CORPORATION'S subsidiaries have operations in the United

12 States and various non-United States jurisdictions, including Cameroon.  They are

13 subject to the tax laws and regulations of the United States federal, state and local

14 governments and of many non-United States jurisdictions.[7]

15     14.   There is such unity of interest and ownership among the AES

16 CORPORATION and AES SONEL that the separate personalities of these entities

17 no longer exist.  The conduct of AES SONEL "touch and concern" the territory of

18 the U.S. at every level.

19     15.   AES SONEL does not manifest any separate corporate interests of its

20 own.  All decisions of its operations, strategic contracts, billing, organization,

21 executive officers, and the like, are ordered from AES in Virginia, VA. AES

22 SONEL is a subsidiary that executes decisions reached from the parent company

23 headquartered in Arlington, VA regarding supply, distribution, and provision of

---

[6] *See*, Page 72 of Form 10-K, AES CORPORATION filed with United States Securities And
Exchange Commission; *Source*: http://phx.corporate-
ir.net/External.File?item=UGFyZW50SUQ9MTczNjUyfENoaWxkSUQ9LTF8VHlwZT0z&t=1

Second Amended Complaint for Damages        Case .No. CV 13-02326 MRP (PLAx)
*Nyah Tchami William, et al. v. AES*

1  electrical services to plaintiffs, including decisions on investments, maintenance, and

2  funding for necessary improvements in electrical grids, dams, to ensure reasonable

3  supply of electrical power to plaintiffs. AES Corporation from Arlington, VA does

4  not just supervise the activities of AES SONEL but controls its operations and exerts

5  it influence in all major decisions that caused the plaintiffs causes of actions. AES

6  Corporation from Arlington, VA, tells AES SONEL when, if at all, to engage in

7  upgrading of power grids, dams, needed to provided consistent electrical power.

8      16.   Andrés Gluski and Thomas M. O'Flynn[8] certifies in Form 10-K that he

9  and other certifying officer are responsible for establishing and maintaining

10  disclosure controls and procedures and internal control over financial reporting for

11  the AES CORPORATION and have designed such disclosure controls and

12  procedures, or caused such disclosure controls and procedures to be designed under

13  their supervision, to ensure that material information relating to the AES

14  CORPORATION, including its consolidated subsidiaries, is made known to them by

15  others within those entities, particularly during the period in which this report (Form

16  10-K) is being prepared.[9]

17      17.   The "conduct" of AES SONEL justifying each cause of action named in

18  this Second Amended Complaint "occurred" in the USA; that is, AES SONEL in

19  Cameroon is simply, at virtually every level, executing instructions and directives

20  and strategy emanating from USA based directors. The corporate decision-making

21

22  [7] Page 92 of Form 10-K, AES CORPORATION filed with United States Securities And Exchange
   Commission; *Source*: http://phx.corporate-
23  ir.net/External.File?item=UGFyZW50SUQ9MTczNjUyfENoaWxkSUQ9LTF8VHlwZT0z&t=1
   [8] Andrés Gluski, President and Chief Executive Officer of The AES CORPORATION and Thomas
24  M. O'Flynn, Executive Vice President and Chief Financial Officer of The AES CORPORATION,
   certified the Form 10-K of the AES CORPORATION, filed on February 26, 2013, with the United
25  States Securities and Exchange Board, for the year ended December 31, 2012, wherein they
26  certified that the information contained in the Form 10-K relates to the financial condition and
   results of operations, cash flow of the AES CORPORATION.
27  [9] *Source*: http://phx.corporate-
   ir.net/External.File?item=UGFyZW50SUQ9MTczNjUyfENoaWxkSUQ9LTF8VHlwZT0z&t=1
28

Second Amended Complaint for Damages        Case .No. CV 13-02326 MRP (PLAx)
*Nyah Tchami William, et al. v. AES*

for the most part occurs at AES CORPORATION in the USA. All key decisions regarding AES SONEL are made in the USA, all major contracts are drafted in the USA, corporate strategy regarding AES SONEL (Cameroon), are made in the USA, all bills regarding AES SONEL are created in the USA. AES CORPORATION has the right to control nearly every aspect of AES SONEL'S business and management.

18.     AES CORPORATION and their utility businesses are supposed to meet certain reliability standards, such as duration and frequency of outages. The standards are implicit and the utility must operate to meet customer expectations.[10] This action is not a merely complaint for power supply failure, but serious consequences resulted because of series of power supply failure, short circuits, voltage fluctuation which caused numerous death, misery, regular power outages, substantial economic losses, due to power failures between 2001 to the present. The incessant outages have been blamed for the death of four children from one family in Douala (Cameroon). The siblings who died in fire were Njike Laurel Naya, 10 years old, Flore Nya Mbakop, 9 years old, Kandisse Nya Nyamsi, 7 years old, Auriol Nya, 2 years old and many more in Yaounde. Defendants are directly and/or indirectly involved and are liable for various Human rights violations.

19.     Plaintiffs, NYAH TCHAMI WILLIAM; NANA BAMEN NGNANGNA EUGENIE; KAMGA JUSTIN; MOTSEBO; MENDEFO YOUMENI JEAN JULES; MADAME MENDEFO FRIDOLINE; FOWOUO RICHARD; JOHN 1 DOE, JANE 1 DOE: PEOPLE OF JAKIRI SUB-DIVISION; JOHN 2 DOE, JANE

---

[10] *See*, Page 7, Form 10-K, AES CORPORATION filed with United States Securities And Exchange Commission;
Our utility businesses must meet certain reliability standards, such as duration and frequency of outages. Those standards may be specific with incentives or penalties for performance against these standards. In other cases, the standards are implicit and the utility must operate to meet customer expectations.
*Source*:
http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MTczNjUyfENoaWxkSUQ9LTF8VHlwZT0z&t=1

2 DOE: INHABITANTS OF YAOUNDE; JOHN 3 DOE, JANE 3 DOE: INHABITANTS OF NGOA-EKELLE; JOHN 4 DOE, JANE 4 DOE: INHABITANTS OF BAMENDA; BUSINESS GROUP 1: ASSOCIATION OF FISHERMAN; BUSINESS GROUP 2: ASSOCIATION OF MERCHANTS IN ELECTRICAL GOODS; BUSINESS GROUP 3: ASSOCIATION OF CONSTRUCTION WORKERS; BUSINESS GROUP 4: ASSOCIATION OF MILK FACTORIES; AND BUSINESS GROUP 5: ASSOCIATION OF FOOD MARKET ("hereinafter, Plaintiffs"), bring this action on behalf of themselves and all other similarly situated persons against Defendants, as well as any other existing but as yet unnamed Defendants that are culpable for the wrongful acts alleged herein.

20.    The Plaintiffs here claim that Defendants violated settled standards for the protection of human rights recognized by United States legal precedent. The Plaintiffs seek compensation, equitable and other relief under the federal Alien Tort Claims Act (28 U.S.C. § 1350, et. seq.) (Hereinafter "Alien Tort Statute" or ATS), various federal statutes, International laws, and Cameroon law.

21.    The Plaintiff filed this suit under the provisions of the Alien Tort Statute. Acts and/or omissions committed by the Defendants are in violation of the law of nations, law of United States and/or Law of Cameroon. This statute allows U.S. courts to hear human-rights cases brought by foreign citizens for conduct committed outside the United States.

22.    The Plaintiffs bring the this action under the ATS in the United States as the ATS and its accompanying case law and precedent provides comprehensive redress for the Plaintiffs.

23.    In addition, Plaintiffs causes of actions are asserted under Virginia common law. Plaintiffs have moved to transfer this case to the United States District Court, in Arlington, VA, and thus all causes of actions alleged are under Virginia common law.

-8-

# BACKGROUND

24.  Plaintiffs are individuals and business groups who reside in the different regions of Cameroon.

25.  AES CORPORATION provides services in energy sector to 21 countries, including Cameroon, through their distribution business as well as thermal and renewable generation facilities.

26.  AES CORPORATION entered into a contract with the Cameroon government about 12 years ago, in 2001, for the privatization of electricity in Cameroon. The parties to this contract, AES CORPORATION and the Cameroon government intended to benefit consumers of electrical power in Cameroon in general, of which plaintiffs form the group. AES CORPORATION and the government of Cameroon know who it is the populations that are third party beneficiaries of their contract as it calls for the provision, supply, distribution of such electrical power to persons and businesses operating in Cameroon. Plaintiffs do not have a copy of this convention or contract between the AES CORPORATION and the Cameroon government as its attempts to obtain any and all such documentation have been met with stiff resistance and non-responses. However, neither party can in good faith deny the existence of such a contract. In fact, even by conduct, the contract exists as AES CORPORATION was engaged for over a decade with the provision, supply, and distribution of electrical power in Cameroon.

27.  AES CORPORATION is doing business in Cameroon as AES SONEL having its plants at Bafoussam, Bassa, Djamboutou, Edéa, Lagdo, Limbé, Logbaba I, Logbaba II, Oyomabang I, Oyomabang II and Song Loulou, and other small remote network units.

28.   The Cameroon government-owned Sonel was privatized in 2001 and the investment by AES CORPORATION from USA was touted as the needed incentive to improve power generation, but this has not been the case.

29.   The frequent blackouts, voltage fluctuation and short circuits witnessed in several towns across the Cameroon are caused by AES SONEL, and the people of Cameroon are also angry at the huge bills they pay for epileptic supplies.

30.   As of December 31, 2011, Defendants claim to supply electric power to approximately 660,484 customers.   The power supply by AES SONEL is not reliable and thus effecting approximately 660,484 households.

31.   Defendants' acts and/or omissions have caused numerous death, misery, regular power outages, and substantial economic losses to businesses, due to power failures.

32.   Plaintiffs bring this action under the Alien Tort Statute.

## JURISDICTION

33.   The Court has jurisdiction over this case under 28 U.S.C. §1331 (federal question jurisdiction); 28 U.S.C. §1350 (Alien Tort Claims Act); and 28 U.S.C. §1332 (diversity jurisdiction).

34.   Plaintiffs and Defendants are citizens of different states and the damages sought by this Complaint exceed the jurisdictional minimum for this Court.

35.   In addition, Plaintiffs invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. §1367, based upon various federal statutes, with respect to all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same claim.

## PARTIES

36.   Plaintiffs, Nyah Tchami William, father, Nana Bamen Ngnangna Eugenie, mother, are the resident and citizen of Cameroon.  They brings this action

-10-

1 on behalf of their deceased children Njike Laurel Nya, aged 10 years, Flore Nya

2 Mbakop, aged 9 years, Kandisse Nya Nyamsi, aged 7 years, and Auriol Nya, aged 2

3 years.

4   37.   Plaintiffs, Mendefo Youmeni Jean Jules, father, and Madame Mendefo

5 Fridoline, mother, are the resident and citizen of Cameroon, have lost three children,

6 Mendefo Makombou Emelda (6 years old), Douanla Mendefo Franck (3 years old),

7 and Nelsa Mendefo (10 months old).   They lost the children when an electrical

8 failure caused by defendants caused their house to burn down.   They bring this

9 action on behalf of their deceased children.

10   38.   Plaintiffs, Kamga Justin and Motsebo, are the resident and citizen of

11 Cameroon, whose house located at Yaounde, has been damaged by ravaging flames

12 caused because of unreliable power supply.

13   39.   Plaintiff, Fowouo Richard, the resident and citizen of Cameroon, is the

14 carpenter workshop owner at ATP Kondengui Yaoundé, who loss business and

15 suffer damages due to voltage fluctuation, frequent power cuts and heavy bills.

16   40.   John 1 Doe, Jane 1 Doe, the Collective People of Jakiri Sub-Division,

17 have lost machinery, electrical equipment, appliances, etc. due to power outages,

18 voltage fluctuation, and short circuits.

19   41.   John 2 Doe, Jane 2 Doe, Inhabitants of Yaounde, where Defendants'

20 services are deplorable, ranging from profit maximization through shocking bills to

21 irregular electricity supply.

22   42.   John 3 Doe, Jane 3 Doe, Inhabitants of Ngoa-Ekelle, where AES-

23 SONEL and/or ACTIS' agents do not bring the bills (often inflated) in time and

24 when the payment period elapses, the consumer has to pay penalties.   They pay

25 meter rents to AES SONEL and/or ACTIS, but no maintenance is ever carried out

26 by AES SONEL and/or ACTIS on the meters and the most annoying thing is when a

27

28

-11-

1 transformer goes kaput, and there is no maintenance for weeks and they have to live
2 in towns without electricity.

3     43.    John 4 Doe, Jane 4 Doe, Inhabitants of Bamenda, hold AES SONEL
4 and/or ACTIS responsible for the losses they incur in their businesses whenever
5 there is a blackout. Local industries like milk processing plants, soap factories, cold
6 stores and repairers of electrical appliances have lost their business and sometimes
7 these power cuts last for as long as 48 hours.

8     44.    Plaintiff, Business Group 1: Association of Fisherman - their fishes dies
9 due to lack of power. Machinery, refrigerators and cooler are installed at the storage
10 facility of fishermen associations for preserving the highly perishable sea food, but
11 due to the frequent power failure the refrigeration and cooling is not working
12 properly and most of the time thousands of sea food, fish, salmon parish due to lack
13 of refrigeration.

14     45.    Plaintiff, Business Group 2: Association of Merchants in Electrical
15 Goods - suffers economic loses as the electric and electronic appliances suffer
16 damage because of the unreliable electric power supply such as, high voltage
17 fluctuation and short circuits.

18     46.    Plaintiff, Business Group 3: Association of Construction workers –
19 Association of Construction Workers, faces challenges as power outages caused
20 construction machinery to a standstill and delayed the completion of projects. Non-
21 completion of projects on time resulted in economic losses to Association of
22 Construction Workers.

23     47.    Plaintiff, Business Group 4: Association of Milk Factories has badly
24 affected because of the frequent and long power cuts, as they deal in a perishable
25 product - milk - and in case of a blackout, the milk goes bad, causing them
26 economical losses.

27

28

48.     Plaintiff, Business Group 5: Association of Food Market has badly hit by arrogant cuts in electricity supply by AES-SONEL and/or ACTIS without prior notification to consumers. These frequent cuts and sudden restoration of electricity without adequate notification for people to watch their electrical appliances have brought untold hardship to those in the fresh fish business.

49.     Defendant, AES CORPORATION, a Delaware corporation, and its headquarter is located at 4300 Wilson Boulevard, Arlington VA 22203.

50.     Defendant, AES SONEL, is a Cameroon business entity, form unknown, located at Direction Générale - Avenue De Gaulle, Douala, Cameroon.

51.     Defendant, ACTIS CAPITAL LLP, is a private equity firm, having its headquarters at London, England. AES CORPORATION has recently agreed to sale its shareholding in AES SONEL to ACTIS.

### STATEMENT OF FACTS

52.     AES CORPORATION, a Delaware corporation, has its headquarters located 4300 Wilson Boulevard, Arlington, VA 22203. From this headquarters, AES provides energy to customers around the world through its distribution businesses and thermal and renewable power generation facilities. AES has clear physical presence in Virginia, via its headquarters, in Arlington, VA.

53.     By virtue of having its headquarters in Arlington, VA, AES CORPORATION conducts business and operations, signs and executes contracts, engages in civic and community events, pays taxes, pays employees, and other assortment of daily business activities, in Arlington, Virginia. AES CORPORATION has thus purposefully availed itself of the privilege of conducting business in Virginia, and invoked the benefits and protections of its laws.

54.     AES CORPORATION entered into a contract with the Cameroon government about 12 years ago for the privatization of electricity for Cameroon.

-13-

AES CORPORATION, from its headquarters in Arlington, VA, operates and controls its subsidiary AES SONEL, at virtually every level; AES SONEL simply executes instructions and directives and strategy emanating from AES Arlington, VA based directors. The corporate decision-making occurs at AES CORPORATION in Arlington, VA.  All key decisions regarding AES SONEL are made in Arlington, VA, all major contracts are drafted in Arlington, VA, corporate strategies regarding AES SONEL (Cameroon) are made in Arlington, VA, and all bills regarding AES SONEL are created in Arlington, VA.  AES CORPORATION from its headquarters in Arlington, VA has the right to control nearly every aspect of AES SONEL'S business and management, and does so.

55.    Further, the decisions to not invest adequate amounts of capital in Cameroon's electrical power grids which results in sporadic, random, occasional power outages and deadly voltage outages and fluctuations are taken from AES CORPORATION .headquarters in Arlington, VA. The cruel, inhuman, and degrading treatment of plaintiffs, putting in fatal electrical harm's way their persons and property, is as a result of decisions emanating from AES CORPORATION in Arlington, VA.

56.    The actions and inactions of AES CORPORATION in Arlington VA with regards to the provision of adequate and reliable electrical power, consistent with their agreement with the Cameroon government, is a breach of third party contract. This breach of third party contract occurred in Arlington, VA, where the decision is made to under-invest in Cameroon's power grids, sanction electrical power supply unreasonable rationing, power supply cuts, under-funding power grids, and acting with utter disregard for the good of the beneficiaries of its contract with the Cameroon government – its people in general, and in particular, the Plaintiffs.

57.    The aforementioned acts and omissions of AES CORPORATION in Arlington, VA towards Plaintiffs, equally its Virginia-related activities, to wit, and

including without limitation: ordering and sanctioning disruption of electrical supply; ordering and sanctioning rationing of electrical power; random, sporadic, and consistent power outages; neglect of power grids; under-funding of electrical operations in Cameroon; under-funding and lack of adequate maintenance of electrical power grids; over-billing of customers; causing through action or inaction fatal voltage fluctuations in electrical supply to Plaintiffs; failure to follow standard international safety regulations for supply of electrical power in Cameroon; failure to properly generate electricity for Plaintiffs; failure to properly transmit electrical power to plaintiffs; failure in the distribution of electricity to Plaintiffs; inaccurate billings; lack of provision of new electrical service where demanded by Plaintiffs; and so on and forth, all proximately caused, in conjunction, partially conjunction, or alone, the Plaintiff's (as to the individual plaintiff families of Mendoufe and Nychami) wrongful death. As to all Plaintiffs', intentional infliction of emotional distress, negligent infliction of emotional distress, the afore-mentioned cruel, inhuman, or degrading treatment in violation of the ATS, loss of consortium as to the plaintiff families Mendoufe and Nychami, unfair, unlawful, and fraudulent business practices.

58.   AES CORPORATION, with headquarters in Arlington, VA, is a global power company that has about $18 billion (USD) in annual revenues, a global workforce of approximately 25,000 people, and operates in 21 countries across five continents. AES is a Fortune 500 company as published by Fortune Magazine that ranks the top 500 U.S. closely held and public corporations as ranked by their gross revenue after adjustments made by Fortune to exclude the impact of excise taxes. AES CORPORATION set-up its headquarters in Arlington, VA, and receives the benefits and protections of all laws there. It has an abundance of financial, personnel, and other administrative resources and evidence located in Arlington, VA, including easy access to witnesses. In light of the foregoing, the exercise of

-15-

1    jurisdiction at the district courts in Arlington, Texas is reasonable and comports with

2    fair play and substantial justice.

3         59.   Sonel was privatized in 2001 and the investment by AES

4    CORPORATION (American Corporation) was touted as the needed incentive to

5    improve power generation, which proved as fallacious. The resulting company was

6    called AES SONEL.

7         60.   As noted in the introduction, and reaffirmed here as a statement of fact,

8    from August 2012 to March 2013, Cameroon recorded 8,337 power cuts. There is no

9    single day in Cameroon that the population goes without recording a minimum of

10   ten electricity cuts per day.  The damage is enormous. Businesses have suffered.

11   The sudden return of electricity has resulted to fire outbreaks. Of late, fire outbreak

12   in some markets like Bamenda main market, Mokolo market in Yaounde, Marche

13   Congo in Douala markets etc. in Cameroon were as a result of uncontrolled

14   electricity supply.   Notwithstanding, some deaths have been recorded. Recently,

15   high tension cable burnt to death a herdsman and three of his cows in Nkambe.

16   Domestic users suffer intolerable discomfort. Household electronic equipment

17   suffers the most with high voltage or when electricity comes back. The sad story is

18   that when the power flows back on, the tension on the line is often vastly over the

19   220 Volts limit, home appliances cannot support such high tensions and often go up

20   in flames when the power cut comes to an end. The best bakery of Douala was lost

21   to fire due to a power cut in February. Thousands of home appliances are destroyed

22   on daily basis but AES SONEL doesn't compensate consumers for the destruction. It

23   is precisely against this backdrop that plaintiffs, who are individuals who lost

24   children, family, as well as businesses who lost entire savings and inventory, bring

25   this lawsuit.

26        61.   Further, consumers in Cameroon in general, and Plaintiffs in particular,

27   are taken for granted given that no one is informed as to when electricity will return

28

Second Amended Complaint for Damages      Case .No. CV 13-02326 MRP (PLAx)
*Nyah Tchami William, et al. v. AES*

1  or when it will be cut. When AES SONEL officials announced the construction of

2  thermal plants in the country, those who rely on energy for their daily activities

3  jumped.  The pathetic thing is that the Bamenda Thermal Plant worth hundreds of

4  millions of FCFA has never functioned.  The Kribi Gas Plant which was expected to

5  go operation four months ago is casting doubts in the minds of consumers. This

6  plant is estimated at about FCFA 200 billion FCFA. Time after time after time, the

7  basic human right, a fundamental right, to power or electricity is violated with an

8  apparent divine impunity not seen since the age of Divine Right of Kings in

9  medieval Europe, where despotic Monarchs were not questioned, and their actions

10 were deemed God's Will on earth. Just as in those days of absolute monarchy,

11 neither Plaintiffs nor consumers have any redress against Defendants' actions and

12 inactions, torture and neglect, humiliation and total lack of treatment or

13 considerations as human beings, let alone consumers; against the incessant and

14 continuous violations of their basic human rights to power. And all this while,

15 consumers are billed to the tilt for non-existent services, or at best, fatally – in the

16 literal sense - flawed services.

17    62.    The frequent blackouts witnessed in several towns across the Cameroon

18 have been blamed on AES SONEL and/or ACTIS, and the people of Cameroon are

19 also angry at the huge bills they pay for epileptic supplies.  Plaintiff, Fowouo

20 Richard, carpenter workshop owner at ATP kondengui Yaoundé, who loss business

21 and suffer damages due to voltage fluctuation, frequent power cuts and heavy bills.

22    63.    People in small towns are badly affected due to the power failure, as

23 their complaints remains unattended for long times, and they have to live in dark and

24 doing all work manually.  Moreover, short circuit and high voltage fluctuation most

25 of the time become the reason for fire and endangered life and property of the

26 Cameroonian. Defendants are not giving due consideration to the public health,

27 safety, and welfare of the Plaintiffs.

28

64.   In a very recent incidence, incessant power outages have been blamed for the death of four children from one family in Douala (Cameroon).  The siblings who died in the fire caused by power and volt outages are; Njike Laurel Nya, 10 years old, Flore Nya Mbakop, 9 years old, Kandisse Nya Nyamsi, 7 years old, and Auriol Nya, 2 years old.[11]

65.   On or about February 24, 2013, three kids of a family in Yaoundé, Mendefo Makombou Emelda (6 years), Douanla Mendefo Franck (3 years), and Nelsa Mendefo (10 months) were killed in a fire, caused due to unreliable power supply, power and volt outages, by AES SONEL and/or ACTIS. The pictures of the bodies of kids and fire burnt house are fully incorporated herein and attached hereto as **Exhibit "A"**.

66.   There are many other similar incidents of fire caused due to short circuit/power failure or voltage fluctuations.[12]

67.   Outages are just part of the story. When the power flows back on, the tension on the line is often vastly over the 220 Volts limit. Home appliances cannot support such high tensions and often go up in flames when the power cut comes to an end. The best bakery of Douala was lost to fire due to a power cut in February. Plaintiffs have all suffered due to these, including paying with the loss of their 9 children, and that's only counting those currently represented in this complaint.

68.   The Collective People of Jakiri Sub-Division have lost machinery, electrical equipment, appliances, etc. due to power outages, voltage fluctuation, and

---

[11] http://thecameroonnews.com/index.php?itemid=936
[12] The last incident (publicized) is that of a child who died in similar circumstances in Adamawa. Other types of fires also affected souls. Friday, February 22 current, the general direction of the equally famous hardware Quifeurou Akwa Douala is on fire. Exit Quifeurou, it was the turn of perfumery Gandour Bonabéri to suffer the violence of the flames March 2, 2013. Then the bakery "Chococho" and the snack bar "The Turk" Bonapriso to be in Douala reduced to ashes. This early hours of the day Monday, March 4, 2013. The same day, next Ngaoundéré a deposit which contained twenty gas cylinders exploded, taking with him twenty shops nearby. Last but not least,

-18-

short circuits.   The people of Jakiri sub-division are suffering badly after the privatization of electricity (AES SONEL) in Cameroon.   Frequent power failures, high voltage fluctuation, and electricity outage in the region is the cause of many troubles, such as damage of electrical, electronic appliance and machinery, doing most of the work manually without using machinery due to electricity outage. Without electricity, all work took longer time than normal, use of machineries, electronic and electrical appliances are luxury in Cameroon and are very unaffordable to the majority.   In small towns, the complaints of the electricity remain unattended for long times, which caused long and complete blackouts.

69.   Inhabitants of Yaounde, where AES SONEL and/or ACTIS' services are deplorable, ranging from profit maximization through shocking bills to irregular electricity supply.

70.   Inhabitants of Ngoa-Ekelle, where AES SONEL and/or ACTIS' agents do not bring the bills (often inflated) in time and when the payment period elapses, the consumer has to pay penalties.   They pay meter rents to AES SONEL and/or ACTIS, but no maintenance is ever carried out by AES SONEL and/or ACTIS on the meters and the most annoying thing is when a transformer goes kaput, and no maintenance is done for weeks and they have to live in towns without electricity.

71.   Inhabitants of Bamenda, hold AES SONEL and/or ACTIS responsible for the losses they incur in their businesses whenever there is a blackout. Local industries like milk processing plants, soap factories, cold stores and repairers of electrical appliances have lost their business and sometimes these power cuts last for as long as 48 hours.

72.   People in Cameroon have no other option but to live in the environment where danger arising out of the unreliable electricity always surrounds them. This

the supermarket fire "Arno" in Yaoundé. Certainly the list is not exhaustive. The rating is more than salt.  (Source: http://www.cameroonvoice.com/news/news.rcv?id=10103 )

effect seriously injuring all Plaintiffs including grossly humiliating and debasing them, forcing them to live in an environment against their will and conscience, inciting fear and anguish, and/or breaking Plaintiffs' physical and moral resistance.

73.    AES CORPORATION is into business of power generation and power supply in 21 countries, but the standards and policies adopted by AES CORPORATION are different for developing and developed countries.    If AES CORPORATION follow the same standards in U.S. as it has been following in Cameroon, it would face heavy penalties for its acts, but as Cameroon is young country and its judicial system has not yet been so developed and AES SONEL has supremacy and monopoly in the power sector, so taking the advantages of all these factors AES CORPORATION through its subsidiary AES SONEL, is taking benefits and earning more and more profits without considering the consequences of sub-standard services they are providing in the Cameroon.    AES CORPORATION is not applying the international norms of power supply in Cameroon and as such the claims of the Plaintiffs are cognizable under the ATS. It is this very violation by defendants of international norms of power supply, vis-a-vis plaintiffs, that is the root of this action.

74.    Defendants are curtailing the right to work and livelihood of people living in undeveloped or developing countries like Cameroon.  Further, unreliable, insufficient, uncontrolled power supply, and short circuits were/are the main reasons for fire breakouts in houses and business groups/units in Cameroon, causing deaths and economic losses to the people and/or to the business community in Cameroon, including Plaintiffs.    Defendants are infringing Human Rights by deliberately providing sub-standard power supply in Cameroon, causing numerous deaths and economic losses.    The act and/or omissions of AES SONEL are *sufficient to constitute a violation of an appropriate international law norm.*    National

1  Commission on Human Rights and Freedoms (NCHRF)[13] has identified impacts of

2  business on human rights in Cameroon from the activities of para-statal companies

3  like, AES SONEL.[14] The Plaintiffs in this action have suffered immensely from

4  these violations of international law norms, including losing 9 infants and children,

5  bodies charred from fire (see Exhibit A), and businesses losing tens of millions of

6  dollars ( USD ) due to Defendants' actions.   There can be no more heinous action

7  that allowing a state of affairs where plaintiffs, and Cameroon consumers, are living

8  in constant violation of their human rights, depravation of access to electrical power,

9  and when such power returns, are faced with consistent fears of appliances burning,

10  houses on fire, and death; or seeing loved ones suffer in pain in hospitals due to

11  unreliable power supply even in major cities, in violation of defendants convention

12  with the Cameroon government. A corporation that does act, like defendants herein,

13  is and should be declared an enemy to all mankind.

14      75.    Defendants engage in the provision, supply, and distribution of

15  defective, unreliable, fatal, inconsistent electrical power. Their conduct violates all

16  internationally known safe conducts with regards to the provision of power. It is now

17  generally accepted that energy or electrical energy or power is essential to basic

18  human rights. Provision of reasonable electrical services in supply, distribution, and

19  provision equates to an adherence to norms that are international know as safe, and

20  are specific, universal, and obligatory. Defendants fail in every respect to provide to

---

23  [13]  NCHRF was established in 1990 with a legislative mandate since 2004. It is currently

24  accredited to A-status by the ICC. It has 6 offices and a complement of approximately 140
    commissioners and personnel in total. NCHRF reports involvement in the human rights and

25  business area since 2004. The President of NCHRF took part in the ICC's Edinburgh Biennial
    Conference on Business and Human Rights in 2010. Subsequently, NCHRF volunteered to host

26  NANHRI's Regional Workshop on Business and Human Rights which was held in Yaoundé in
    October 2011. NCHRF has established a human rights and business Focal Point.

27  [14] Source: http://www.nanhri.org/phocadownload/mapping%20survey%20on%20bhr%20-
    %20role%20of%20nhris%20-%20final%20version.pdf

28                                    -21-

1  plaintiffs reasonable electrical services which do not violate international norms; this

2  duty by defendants is a violation of human rights.

3       76.    Defendants' actions, including but not limited to, unsafe, even fatal,

4  provision, distribution, and supply of electrical power is degrading, inhuman, and

5  cruel.  These actions have proximately caused Plaintiffs' infants and children to be

6  burnt due to fatal supply of electrical power combined with fluctuating voltages, and

7  Plaintiffs' businesses to lose entire inventories due to same cause and action of

8  Defendants.

9       77.    Defendants' actions, including but not limited to, unsafe, even fatal,

10  provision, distribution, and supply of electrical power, and taking and making those

11  decisions from Arlington, VA, which propagates this state, resulted in loss of

12  children, loss of entire business inventory, loss of GDP of billions of USD. It has

13  inflicted mental and physical suffering of plaintiffs, as the parents of the 9 children

14  burnt in the fire (families of Mendoufe and William) spent weeks weeping, in

15  depression, unable to work, suicidal thoughts, and feelings of utter debasement.

16  Even where the losses are only economic, as for the plaintiffs who are business

17  groups, they suffered mentally, felt debased as they watched entire life savings

18  evaporated in flames due to defendants unsafe and inconsistent supply of electrical

19  power. Defendants' supply of power is not just, but rather better described as

20  consistently inconsistent, fatal, and consistently unreliable and dangerous.

21       78.    Business Group 1: Association of Fisherman also suffering economic

22  damages because of electric power outage.  The frequent power failures cause their

23  fish and other products to rot.  The machinery, refrigerators and cooler are installed

24  at the storage facility of fishermen associations for preserving the highly perishable

25  seafood, but due to the frequent power failure the refrigeration and cooling is not

26  working properly and most of the time thousands of sea food, fish, salmon parish

27  due to lack of refrigeration.

28

Second Amended Complaint for Damages    Case .No. CV 13-02326 MRP (PLAx)
*Nyah Tchami William, et al. v. AES*

79.     Business Group 2: Association of Merchants in Electrical Goods suffers economic loses as the electric and electronic, appliances got damaged because of the unreliable electric power supply, high voltage fluctuation and short circuits.   They experience power failure almost every day, and when electricity surges back with high voltage, their machines go kaput.

80.     Business Group 3: Association of Construction Workers faces challenges as power outages caused construction machinery to a standstill and delayed the completion of projects.  Non- completion of projects on time resulted in economic losses to Association of Construction Workers.

81.     Business Group 4: Association of Milk Factories has badly hit because of the frequent and long power cuts, as they deal in a perishable product - milk - and in case of a blackout, the milk goes bad, causing them economical losses.

82.     Business Group 5: Association of Food Market has badly hit by arrogant cuts in electricity supply by AES-SONEL and/or ACTIS without prior notification to consumers. These frequent cuts and sudden restoration of electricity without adequate notification for people to watch their electrical appliances have brought untold hardship to those in the fresh fish business.

## GENERAL ALLEGATIONS

83.     At all times relevant herein, Defendants knew or should have known that the power supply to Cameroon is/was not reliable and suffer consistent power outages.

84.     AES, with headquarters in Arlington, VA, is a global power company that has about $18 billion (USD) in annual revenues, a global workforce of approximately 25,000 people, and operates in 21 countries across five continents. AES is a Fortune 500 company as published by Fortune Magazine that ranks the top 500 U.S. closely held and public corporations as ranked by their gross revenue after

-23-

adjustments made by Fortune to exclude the impact of excise taxes. AES set-up its headquarters in Arlington, VA, and receives the benefits and protections of all laws there. AES business operations in Arlington, VA are accordingly continuous and systematic.

85.     There is a unity of interest among all defendants. AES Sonel is majority owned by AES Corporation. AES, from its headquarters in Arlington, VA, operates and controls its subsidiary AES Sonel, at virtually every level; AES Sonel simply executes instructions and directives and strategy emanating from AES Arlington, VA based directors. The corporate decision-making occurs at AES CORPORATION in Arlington, VA.  All key decisions regarding AES SONEL are made in Arlington, VA, all major contracts are drafted in Arlington, VA, corporate strategies regarding AES SONEL (Cameroon) are made in Arlington, VA, and all bills regarding AES SONEL are created in Arlington, VA.  AES CORPORATION from its headquarters in Arlington, VA has the right to control nearly every aspect of AES SONEL'S business and management, and does so. Further, the lack of capital investment in electrical grid or power infrastructure is reached in Arlington, VA, and that's a key element which results in all causes of actions: the failure to supply even a modicum of reliable, or consistent, or adequate, or non fatal electricity; or a modicum of voltage reliability and consistency, in non-destructive and non-fatal doses. AES CORPORATION does not adequately funds or capitalize invest in AES SONEL.  It would be unjust to separate the entities. Meantime, AES CORPORATION from its headquarters in Arlington, VA, reaps all the financial benefits of billing plaintiffs for services not rendered, or rendered to fatal results, or business evisceration results for Plaintiffs.

86.     Similarly, there is a unity of interest between Defendants AES CORPORATION and ACTIS.  The latter is the successor entity in interest of the former.

-24-

87.     At all times relevant hereto, Defendants knew and should have known that there is high voltage fluctuation and could cause of short circuit resulting in fire and destruction of property and could endanger human lives.

88.     Defendants precise actions noted throughout this complaint, and herein incorporated as though fully set forth herein, are the direct and proximate causes of plaintiffs injuries: Defendants action and inactions, from their headquarters in Virginia, VA, including failure to supply electrical power, provision of inadequate electrical power, failure to maintain electrical power grids, upgrade electrical power grids, power outages, fatal power voltage fluctuations, inadequate investment in power grids and infrastructure, faulty and inaccurate billings, violation of human rights of plaintiffs, and much more, as previously set in, are all actions taken in Arlington, VA, that led to plaintiffs causes of actions, including – cruel, inhuman or degrading treatment ( by denying plaintiffs access to electricity or power, a basic human right, and by extension of this, denying plaintiffs access to other basic human rights which are a by-product of having electrical power access ); breach of third party contract ( defendants have failed to provide electrical power services to plaintiffs consistent with their representations and promises in the convention with the Cameroon government, of which plaintiff's in particular, and Cameroon consumers in general, are the third party beneficiaries); wrongful death ( power outages and voltage fluctuations at the homes of plaintiff families Mendoufe and William caused fires to start, causing horrific death by fire to 9 children in both homes, as well as the homes being burnt to the ground); same actions all noted above have caused emotional distress to all plaintiffs; said actions are at best intentional, at worst, negligent, and defendants should be held responsible for failing to maintain reasonable standards of supply of electrical power; the loss of children resulted in loss of consortium for the families. Taken all together, Defendants'

1  actions and inactions are directly related and the proximate causes of each and every

2  cause of action alleged herein.

3      89.    As a direct and proximate result of Defendants' conduct as alleged

4  herein, Plaintiffs have suffered and will continue to suffer harm, including pain and

5  suffering, and extreme and severe mental anguish and emotional distress as well as

6  harm to their business activities.

7      90.    Plaintiffs further allege that they seek to hold defendants, and AES

8  Corporation and ACTIS in particular, liable in this court for their losses because of

9  the unity of ownership and interest detailed above between all defendants, their

10  actions violate the law of nations as it infringes substantially upon the basic human

11  rights of plaintiffs such as access to power and access to a normal daily life, to food,

12  water, and the like; further defendants actions which caused this harm originated

13  from their headquarters in Arlington, VA where the decisions on how to operate

14  AES SONEL, how to invest ( or not invest adequately in this case which results in

15  horrific supply, provision, and distribution of power ) in AES SONEL, were arrived

16  at in Arlington, VA. In addition, defendants AES Corporation and ACTIS are

17  reaping the benefits of their actions and policies that results in death of infants and

18  children, and losses of hundreds of millions of dollars by Plaintiffs.  It is only fair

19  and just that they answer to their actions in this court, in Arlington, VA.  They

20  should not take away money from Cameroon consumers and seek to shield

21  themselves in Arlington, VA. As noted above, the key conduct occurred in the

22  United States, at the AES Corporation headquarters in Arlington, VA.

23      91.    This action, with all the key misconducts occurring at defendants

24  headquarters in Arlington, VA, touches and concerns the territory of the United

25  States. The United States is well known as a nation of laws, of justice, of checks and

26  balances between its three branches of government. The United States is a well

27  recognized signatory to virtually all international treaties and conventions that

28

protect human rights, protects rights of homosexuals, of refugees, of people of different races, religion, language, or other social group from prosecution. Because there is a paramount sense of justice embedded at every level of the U.S. justice system - its legislative branch, its executive branch, and even its populace, - the defendants fatal supply, provision, and distribution of electrical power and fluctuating voltages that causes deaths of infants, children, adults, fire blaze of properties, hundreds of millions of dollars in economic losses, all proximately caused by actions occurring in the U.S., by a U.S. corporation, that is reaping benefits from the impoverished and humiliated plaintiffs, and said actions a violation of basic human rights, and access to other basic human rights, is of such force as to displace any presumption against extraterritorial application. The United States would be touched and concerned, and as a nation of justice, would want to see whether its U.S. Corporation, obligated to not only obey U.S. laws, but the laws of nations, international treaties, may be found liable for their actions emanating in the U.S., even though the injuries may occur thousands of miles away.

92. The conduct of defendant, engaging in actions in the U.S. by making decisions from Arlington, VA headquarters that cause violations of plaintiffs' human rights to energy and access to other fundamental human rights of plaintiffs such as right to social order, right to rest and leisure, freedom from interference with privacy, right to life, liberty, security, all at grave peril by defendant actions, is of the type that may have serious consequences in international affairs. If U.S. foreign corporations can contract to provide fundamental and essential services to a population in a third World Country, and then deliver them in the most dehumanizing, degrading, cruel, fatal, and unjust ways possible, also in violation of their convention with the government, all the while skimming money from the impoverished population,  and returning the money to their U.S. banks, with impunity and without a venue to be held accountable for their actions, then other

-27-

1  nations may follow suit, and we may find ourselves in a world, as famously ordained

2  by English philosopher Thomas Hobbes, where "life is brutish, short, and nasty." In

3  keeping with the history of the ATS, legislative intent, this case is exactly of the type

4  the ATS sought to remedy.

## FIRST CLAIM FOR RELIEF: CRUEL, INHUMAN, OR DEGRADING TREATMENT
### (Claim by all Plaintiffs against all Defendants)

93.   The allegations set forth in paragraphs 1 through 91 of the Second Amended Complaint are realleged and incorporated by reference as if fully set forth herein.

94.   The wrongful acts described herein had the intent and the effect seriously injuring all Plaintiffs including grossly humiliating and debasing them, forcing them to live in an environment against their will and conscience, inciting fear and anguish, and/or breaking Plaintiffs' physical and moral resistance.

95.   The acts described herein constitute cruel, inhuman or degrading treatment in violation of the Alien Tort Claims Act, customary international law, the common law of the United States, and the international treaties, agreements, conventions and resolutions.

96.   Defendants' acts alleged herein caused Plaintiffs to be placed in great fear for their lives and forced them to suffer severe physical and psychological abuse and agony.

97.   Defendants knowingly committed, commanded, directed, and/or participated in these acts, and did not act to prevent or punish these violations of human rights as embodied in international and domestic law.

-28-

98.   As a result of Defendants acts, Plaintiffs suffered severe physical and mental pain and suffering and sustained material, physical, and emotional damage, and are entitled to compensatory damages, the exact amount to be proven at trial.

99.   Defendants' acts of cruel, inhuman, or degrading treatment against Plaintiffs were/are willful, intentional, wanton, malicious, and oppressive and warrant an award of punitive damages to Plaintiffs in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF: BREACH OF THIRD PARTY CONTRACT
### (Claim by all Plaintiffs against all Defendants)

100.   The allegations set forth in paragraphs 1 through 98 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

101.   Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, entered into a written contract with Cameroon Government pursuant to which the Defendants agreed to supply reliable power supply to Cameroon country.  This contract was entered into for the benefits of Cameroon people, including Plaintiffs.

102.   AES CORPORATION, upon information and belief, entered into a contract with the Cameroon government about 12 years ago, in 2001, for the privatization of electricity in Cameroon. The parties to this contract, AES CORPORATION and the Cameroon government intended to benefit consumers of electrical power in Cameroon in general, of which plaintiffs form the group. AES CORPORATION and the government of Cameroon know who it is the populations that are third party beneficiaries of their contract as it calls for the provision, supply, distribution of such electrical power to persons and businesses operating in Cameroon. Plaintiffs do not have a copy of this convention or contract between the

-29-

1  AES CORPORATION and the Cameroon government as its attempts to obtain any
2  and all such documentation have been met with stiff resistance and non-responses.
3  However, neither party can in good faith deny the existence of such a contract. In
4  fact, even by conduct, the contract exists as AES CORPORATION was engaged for
5  over a decade with the provision, supply, and distribution of electrical power in
6  Cameroon.

7      103.  AES CORPORATION and their utility businesses are supposed to meet
8  certain reliability standards, such as duration and frequency of outages.  The
9  standards are implicit and the utility must operate to meet customer expectations.[15]
10  AES CORPORATION has failed to maintain the standards as it has claimed.

11      104.  Plaintiffs are informed and believe and based thereon allege that
12  Defendants breached said contract in that they failed to supply reliable power supply
13  to Cameroon, and there are frequent power failure in the Cameroon.

14      105.  Plaintiffs are informed and believe and thereon allege that, as a direct
15  and proximate result of the power outage, refrigeration units, cooler, machinery,
16  tools, etc. used for construction work, storing seafood, etc., do not work and resulted
17  economic losses.  Breach of contracts by Defendants, and each of them, Plaintiffs
18  suffer damages to the amount presently unknown but will be established at the time
19  of trial, according to proof.

20      106.  Plaintiffs are informed and believe and thereon allege that, as a further
21  direct and proximate result of the uncontrolled high voltage and frequent voltage
22  fluctuations, electric and electronic appliances suffer damages, and are also the main

23

24  [15] *See*, Form 10-K, Page 7, filed with United States Securities And Exchange Commission; our
25  utility businesses must meet certain reliability standards, such as duration and frequency of
    outages. Those standards may be specific with incentives or penalties for performance against
26  these standards. In other cases, the standards are implicit and the utility must operate to meet
    customer expectations.
27  *Source*: http://phx.corporate-
    ir.net/External.File?item=UGFyZW50SUQ9MTczNjUyfENoaWxkSUQ9LTF8VHlwZT0z&t=1
28                                              -30-

Second Amended Complaint for Damages      Case .No. CV 13-02326 MRP (PLAx)
                    *Nyah Tchami William, et al. v. AES*

cause for fire accidents at homes and business places. Defendants are obligated to provide the controlled electric supply to the Plaintiffs. As a result of the breach of contract by the Defendants, and each of them, Plaintiffs suffer damages to the amount presently unknown but will be established at the time of trial, according to proof.

107.   Plaintiffs are informed and believe and thereon allege that, as a direct and proximate result of the foregoing breach of contract, and the actions and/or omissions of the Defendants, and each of them, Plaintiffs have sustained general, special, consequential and incidental damages in an amount presently unknown, in that Plaintiff will be required to perform works on the power voltage control and continuous and reliable power supply to prevent further damage. Plaintiffs will establish the precise amount of damages at trial, according to proof.

108.   Plaintiffs are informed and believe and thereon allege that, as a further direct and proximate result of the breach of contracts by Defendants, and each of them, business groups of Cameroon have sustained damages because of non performance of their projects in time and residents of Cameroon have sustained loss of use and enjoyment of their dwelling units in an amount presently unknown but will be established at the time of trial, according to proof.

## THIRD CLAIM FOR RELIEF: WRONGFUL DEATH

**(Plaintiffs, Nyah Tchami William, Nana Bamen Ngnangna Eugenie; Mendefo Youmeni Jean Jules; Madame Mendefo Fridoline's claim against all Defendants)**

109.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 107 as if fully set forth herein.

110.    As a direct result of Defendants' acts and/or omissions, and as a result of the aforementioned deaths, Plaintiffs have sustained pecuniary loss resulting from loss of society, comfort, attention, services, and support of decedents.

111.    As a direct result of Defendants' acts and omissions, and as a result of the aforementioned deaths, Plaintiffs' have sustained pecuniary loss resulting from loss of society, comfort, attention, services and support of decedents.

112.    Each Defendant is liable for said conduct in that it requested, paid, confirmed, and ratified which caused the wrongful deaths described above.

## FOURTH CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Claim by all Plaintiffs against all Defendants)

113.    The allegations set forth in paragraphs 1 through 111 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

114.    The acts described herein constitute outrageous conduct against Plaintiffs that was unprotected and without privilege.

115.    Defendants intended to cause Plaintiffs to suffer emotional distress; engaged in the conduct with reckless disregard of the probability that its conduct would cause Plaintiffs to suffer emotional distress; Plaintiffs were present at the time the outrageous conduct occurred and Defendants knew that Plaintiffs were present.

116.    Plaintiffs suffered severe emotional distress, which was caused by Defendants' outrageous conduct as alleged herein.

117.    Defendants' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the Federal statutes.

## FIFTH CLAIM FOR RELIEF: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Claim by all Plaintiffs against all Defendants)

118.   The allegations set forth in paragraphs 1 through 116 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

119.   At all relevant times, Defendants owed Plaintiffs a duty to act with reasonable care, and/or injury to Plaintiffs was reasonably foreseeable.

120.   At all relevant times, Defendants had the power, ability, authority and duty to stop engaging in the wrongful conduct described herein and to intervene to prevent or prohibit such conduct.

121.   At all relevant times, Defendants knew, or reasonably should have known, that the conduct described herein would and did proximately result in physical and emotional distress to Plaintiffs.

122.   Despite said knowledge, power, and duty, Defendants breached their duty to Plaintiffs and negligently failed to act so as to stop engaging in the conduct described herein and to prevent or to prohibit such conduct or to otherwise protect Plaintiffs. To the extent that said negligent conduct was perpetrated by Defendants' officials, Defendants confirmed, ratified and participated in said conduct with the knowledge that Plaintiffs' emotional and physical distress would thereby increase and with a wanton and reckless disregard for the deleterious consequences to Plaintiffs.

123.   As a direct and legal result of Defendants' wrongful acts, Plaintiffs have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

124.   Defendants' conduct constitutes the negligent infliction of emotional distress and is actionable under the Federal statutes.

## SIXTH CLAIM FOR RELIEF: NEGLIGENCE/NEGLIGENCE PER SE

### (Claim by all Plaintiffs against all Defendants)

125.   The allegations set forth in paragraphs 1 through 123 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

126.   Defendants' conduct constitutes negligence in that Defendants owed Plaintiffs and decedents a duty to act with reasonable care not to injure them, 2) they breached that duty, 3) it was reasonably foreseeable that Defendants' negligence would cause injury, damage, loss, or harm to Plaintiffs and their next of kin.

127.   Despite having the duty to do so, defendants failed to use ordinary or reasonable care in order to avoid injury to Plaintiffs, including but not limited to through its negligent hiring, training, supervision and/or retention of the Defendants' officials/employees.  Defendants' negligence was a cause of injury, damage, loss or harm to Plaintiffs.

128.   Defendants' conduct constitutes negligence *per se*, because the uncontrolled and unreliable power supply to the dwellings and business units in Cameroon caused deaths, injuries and damages, which violated numerous Federal statutes.

129.   As a result of these acts, Plaintiffs suffered and continue to suffer harm including, but not limited to, severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the Federal statutes, and customary international law.

## SEVENTH CLAIM FOR RELIEF: CIVIL CONSPIRACY

### (Claim by all Plaintiffs against all Defendants)

1    130.   The allegations set forth in paragraphs 1 through 128 of this Complaint

2    are realleged and incorporated by reference as if fully set forth herein.

3    131.   In 2002, Defendants knowingly and willfully conspired and agreed

4    among themselves to engage in supplying unreliable electric power in Cameroon, in

5    violation of the rights of the Plaintiffs.

6    132.   Defendants did the acts and things alleged pursuant to, and in

7    furtherance of, the conspiracy and the above-alleged agreement.

8    133.   Defendants furthered the conspiracy by participation with and/or lent

9    aid and encouragement to or ratified and adopted the acts of the AES SONEL

10   engaged in supplying electric power in Cameroon.

11   134.   As a proximate result of the wrongful acts herein alleged, Plaintiffs

12   have been generally and specially damaged in the loss of life and physical and

13   emotional injuries as alleged above and according to proof.

14   135.   Defendants' conduct constitutes civil conspiracy and is actionable

15   under the Federal statute.

16

17   **EIGHTH CLAIM FOR RELIEF: LOSS OF CONSORTIUM**

18   **(Plaintiffs, Nyah Tchami William, Nana Bamen Ngnangna Eugenie; Mendefo**
19   **Youmeni Jean Jules; Madame Mendefo Fridoline's claim against all**
     **Defendants)**

20

21   136.   The allegations set forth in paragraphs 1 through 134 of this Complaint

22   are realleged and incorporated by reference as if fully set forth herein.

23   137.   At all times prior to their deaths, the decedents noted above were

24   faithful, loving and dutiful children to the Plaintiffs who are their parents.

25   138.   As a result of the acts of Defendants, those Plaintiffs who are the

26   parents of the decedents have been deprived of the decedents' society, comfort,

27   attention, services and support, all to their damage, in an amount to be proved at

28

-35-

1  trial. In addition, those Plaintiffs have suffered and incurred the expenses of funeral

2  and burial for the decedents, in an amount to be proved at trial.

3      139.   Defendants' conduct caused plaintiffs to suffer loss of consortium and

4  is actionable under the Federal statutes.

6  ## NINTH CLAIM FOR RELIEF: NEGLIGENT MISREPRESENTATION

7  ### (Claim by all Plaintiffs against all Defendants)

9      140.   The allegations set forth in paragraphs 1 through 138 of this Complaint

10  are realleged and incorporated by reference as if fully set forth herein.

11      141.   Defendants have engaged in submitting inaccurate bills to Plaintiffs,

12  making false and misleading statements and comments about the state of electrical

13  power supply, the nature of their investments in electrical or power infrastructure in

14  Cameroon, the provision, supply, and distribution of this electrical power to

15  Plaintiffs, and their bias and relationship with partners such as Alucam. In 2010,

16  Defendants upped the prices of electrical consumption and failed to provide notices

17  to consumers about the exact nature of the higher prices or accurate numbers

18  regarding the higher bill amounts.

19      142.   Defendants have claimed to offer mobile bill payment services to

20  Plaintiffs, customer service centers, new power grids, consistent and reliable supply

21  of electrical power, stable (no fluctuation) voltage. These were inaccurate

22  statements. These statements were made on or after August 1, 2012 with regards to

23  Mobile bill pay. Further, Defendants alleged a $58 million effort to improve

24  drought-affected electrical supply in Cameroon. Based on information and belief of

25  plaintiffs, these numbers are inaccurate and little or no improvement was done.

26      143.   Defendants have also claimed, throughout the years, in filings, press

27  releases, statements, interviews, of major successes in the provision, supply and

28

-36-

distribution of electrical power to Plaintiffs. In truth, however, electrical supply in Cameroon is erratic, fatal, and sporadic, with extremely poor customer service, lack of adequate infrastructure investment and development, and overbilling of consumers.

144. Defendants should have known that these statements were false, misleading, would induce justifiable reliance by Plaintiffs.

## TENTH CLAIM FOR RELIEF: INTENTIONAL MISREPRESENTATION

### (Claim by all Plaintiffs against all Defendants)

145. The allegations set forth in paragraphs 1 through 143 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

146. Defendants have engaged in submitting inaccurate bills to Plaintiffs, making false and misleading statements and comments about the state of electrical power supply, the nature of their investments in electrical or power infrastructure in Cameroon, the provision, supply, and distribution of this electrical power to Plaintiffs, and their bias and relationship with partners such as Alucam. In 2010, Defendants upped the prices of electrical consumption and failed to provide notices to consumers about the exact nature of the higher prices or accurate numbers regarding the higher bill amounts.

147. Defendants have claimed to offer mobile bill payment services to Plaintiffs, customer service centers, new power grids, consistent and reliable supply of electrical power, stable (no fluctuation) voltage. These were inaccurate statements. These statements were made on or after August 1, 2012 with regards to Mobile bill pay. Further, Defendants alleged a $58 million effort to improve drought-affected electrical supply in Cameroon. Based on information and belief of Plaintiffs, these numbers are inaccurate and little or no improvement was done.

-37-

148.    Defendants have also claimed, throughout the years, in filings, press releases, statements, interviews, of major successes in the provision, supply and distribution of electrical power to Plaintiffs. In truth, however, electrical supply in Cameroon is erratic, fatal, and sporadic, with extremely poor customer service, lack of adequate infrastructure investment and development, and overbilling of consumers.

149.    Defendants knew the above statements to be false or misleading or inaccurate.

## DEMAND FOR JURY TRIAL

1.    Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

    a.  enter judgment in favor of:

        (i)    Plaintiffs, Nyah Tchami William; Nana Bamen Ngnangna Eugenie; Mendefo Youmeni Jean Jules; Madame Mendefo Fridoline, and on all counts of the Complaint for Plaintiffs' damages in excess of twenty five million dollars ($25,000,000.00).

        (ii)    Plaintiffs, Kamga Justin; Motsebo; Fowouo Richard; John 1 Doe, Jane 1 Doe: People of Jakiri Sub-Division; John 2 Doe, Jane 2 Doe: Inhabitants of Yaounde; John 3 Doe, Jane 3 Doe: Inhabitants of Ngoa-Ekelle; and John 4 Doe, Jane 4 Doe: Inhabitants of Bamenda, on all counts, except count 3rd and

8th, of the Complaint for Plaintiffs' damages in excess of twenty-five million dollars ($25,000,000.00).

(iii)  Plaintiffs, Business Group 1: Association of Fisherman; Business Group 2: Association of Merchants in Electrical Goods; Business Group 3: Association of Construction workers; Business Group 4: Association of Milk Factories; and Business Group 5: Association of Food Market, on all counts, except count 3rd and 8th, of the Complaint for Plaintiffs' damages in excess of twenty-five million dollars ($25,000,000.00).

b. Award the Plaintiffs compensatory and punitive damages $50,000,000;

c. Grant the Plaintiffs equitable relief including, but not limited to, an injunction prohibiting further damage to their persons, and their rights under the federal statutes and customary international law;

d. Award Plaintiffs the costs of suit including reasonable attorneys fees;

e. Enter a judgment in favor of Plaintiff and order Defendants for specific performance of the contract with the government of Cameroon; and

//

//

//

-39-

f. Award Plaintiffs such other and further relief as the Court deems just and equitable under the circumstances.

Date: March 10,  2014

Respectfully Submitted,

EMMANUEL NSAHLAI

By: _____

NSAHLAI LAW FIRM

EMMANUEL NSAHLAI, SBN (207588)
Email: nsahlai.e@nsahlailawfirm.com
3460 WILSHIRE BLVD, STE 1220
LOS ANGELES, CA 90010
Tel (213) 674-4181
Fax (213) 738-0828

Attorney for Plaintiffs

Second Amended Complaint for Damages        Case .No. CV 13-02326 MRP (PLAx)
*Nyah Tchami William, et al. v. AES*

1

2

## **CERTIFICATE OF SERVICE**

3

4      I HEREBY CERTIFY that on March 10, 2014 , I directed that the foregoing document be electronically filed with the Clerk of the Court by using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

5

6      Attorneys for Defendants
          Hogan Lovells US LLP

7          Columbia Square
          555 Thirteenth Street, NW

8          Washington, DC 20004

9          Tel: +1 202 637 5600
          Direct: +1 202 637 5719

10         Fax: +1 202 637 5910

11         Email: chris.handman@hoganlovells.com

12

13                              By:_____

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                      -41-

28     _____
       Certificate of Service              Case .No. CV 13-02326 MRP (PLAx)
                    *Nyah Tchami William, et al. v. AES*

**Exhibit "A"**
(Photographs)















































