IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

NYAH TCHAMI WILLIAM, et al.,    )
                                )
        Plaintiffs,             )
                                )
            v.                  )    1:14cv343 (JCC/TRJ)
                                )
THE AES CORPORATION AND AES     )
SONEL,                          )
                                )
        Defendants.             )

**M E M O R A N D U M   O P I N I O N**

At issue in this case is whether a parent corporation headquartered in Virginia and its Cameroonian subsidiary can be liable under the Alien Tort Statute and Virginia common law for injuries stemming from alleged power failures in Cameroon. Currently before the Court is Defendants AES Corporation ("AES") and AES Sonel's ("Sonel") (collectively "Defendants") Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC"). For the following reasons, the Court will grant Defendants' Motion to Dismiss.

## I.   Background

This case arises out of power failures in Cameroon allegedly caused by a power company, Defendant Sonel. Plaintiffs, all citizens and residents of Cameroon, seek relief

pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 and Virginia common law for injuries allegedly caused by these power failures.

A.   Factual Background

AES is a Delaware corporation, headquartered in Arlington, Virginia.  (SAC ¶ 2.)  AES is a holding company which owns a portfolio of electricity generation and distribution businesses.  AES owns 56% of Sonel, a subsidiary corporation located in Cameroon.  The Cameroonian government owns the remaining 44% of Sonel, and Sonel is the sole distributor of electricity in Cameroon.  (SAC ¶ 8.)  AES recently sold its shares in Sonel to Actis Capital, LLP ("Actis"), a private equity firm headquartered in the United Kingdom.  (SAC ¶ 6.)  Plaintiffs have not filed any proof of service of process on Actis.  Thus, the movants here are only AES and Sonel.  (Def. Mem. at 3.)

According to the SAC, in 2001 AES entered into a contract with the government of Cameroon "for the privatization of electricity in Cameroon."  (SAC ¶ 26.)  Plaintiffs allege that AES and the government of Cameroon "intended to benefit consumers of electrical power in Cameroon."  (SAC ¶ 26.)  The contract allegedly provides for the provision, supply and distribution of electrical power in Cameroon.  (SAC ¶ 26.)  Plaintiffs do not have a copy of this alleged contract.

2

Plaintiffs allege that Sonel, formerly a government owned corporation was privatized in 2001 and that "investment by AES corporation from USA was touted as the needed incentive to improve power generation." (SAC ¶ 28.)

Plaintiffs allege that the electrical supply provided by Sonel is characterized by short circuits, voltage fluctuation and electrical supply failure. (SAC ¶ 2.) Plaintiffs allege that this substandard electrical supply has led to "death, misery, regular power outages, and substantial economic losses" between 2001 and the present. (SAC ¶ 2.) From August 2012 to March 2013, for example, Cameroon recorded 8,337 power cuts. (SAC ¶ 11.) When the electricity comes back on after an outage, high voltage on the line allegedly causes fires which have damaged homes and businesses. (SAC ¶¶ 11, 38-41.) Plaintiffs allege that these fires have resulted in the deaths of several children. (SAC ¶¶ 36-37.)

Plaintiffs further allege that Defendants do not timely provide consumers with their bills, (SAC ¶ 42), and that specific local industries, including fishermen, (SAC ¶ 44), merchants in electrical goods, (SAC ¶ 45), construction workers, (SAC ¶ 46), milk factories, (SAC ¶ 47), and food markets (SAC ¶ 48), have sustained economic losses because of electrical blackouts. (SAC ¶ 43.)

Plaintiffs aver that Sonel is "dependent on the AES Corporation for the management and all major activities necessary for the power generation, supply and regulation of the power supply in Cameroon." (SAC ¶ 10.)  Plaintiffs allege that Sonel "simply executes instructions and strategy emanating from AES" and that the "lack of capital investment in electrical grid or power infrastructure is reached in Arlington, VA." (SAC ¶ 85.)

Plaintiffs bring suit under the ATS and Virginia law. Plaintiffs assert ten claims: (1) cruel, inhuman or degrading treatment actionable under the ATS; (2) breach of third-party contract; (3) wrongful death; (4) intentional infliction of emotional distress; (5) negligent infliction of emotional distress; (6) negligence / negligence per se; (7) civil conspiracy; (8) loss of consortium; (9) negligent misrepresentation; and (10) intentional misrepresentation. Plaintiffs seek compensatory and punitive damages, injunctive relief, specific performance of contract, and attorney's fees and costs. (SAC at 38-39.)

B.   Procedural Background

On April 1, 2013, Plaintiffs filed their original complaint in the Central District of California. [Dkt. 1.]  On October 15, 2013, Judge Gutierrez granted Plaintiffs' Motion for Leave to File First Amended Complaint ("FAC"). [Dkt. 20.]  On

4

November 14, 2013, AES moved to dismiss the FAC for lack of personal jurisdiction under Rule 12(b)(2).  [Dkt. 29.]  On February 6, 2014, Judge Gutierrez granted AES's motion to dismiss Plaintiffs' FAC with leave to amend.  [Dkt. 38.]

On March 10, 2014, Plaintiffs filed their Second Amended Complaint, [Dkt. 40], and Motion to Transfer Venue, pursuant to 28 U.S.C. § 1404(a) to the Eastern District of Virginia, [Dkt. 39].  On March 31, 2014, Judge Gutierrez granted Plaintiffs' Motion to Transfer Venue.  [Dkt. 52.]

On April 21, 2014, Defendants AES and Sonel filed their Second Motion to Dismiss for Failure to State a Claim ("Motion").  [Dkt. 56.]  On May 12, 2014, Plaintiffs filed their opposition.  [Dkt. 64.]  In their opposition brief, Plaintiffs did not address counts 5 (negligent infliction of emotional distress), 7 (civil conspiracy), 8 (loss of consortium), 9 (negligent misrepresentation), or 10 (intentional misrepresentation).  By failing to address these counts in their opposition, Plaintiffs have effectively abandoned these claims. Nevertheless, the Court will briefly address the insufficiencies of these counts.  *See Freight Drivers & Helpers Local Union No. 557 Pension Fund ex rel. Joint Bd. of Trustees v. Penske Logistics LLC*, No. CIV.A. ELH-12-2376, 2014 WL 547043, at *8 (D. Md. Feb. 7, 2014); *Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F. Supp. 2d 432, 440 (D. Md. 2001)

("Plaintiffs appear to concede this point, as they have failed to respond to this argument").  Defendants filed their reply on May 19, 2014.  [Dkt. 68.]

Defendants' Motion is now before the Court.

## II.  Standard of Review

### A.  12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) permits dismissal of an action when the Court lacks personal jurisdiction over the parties.  The plaintiff bears the burden of demonstrating personal jurisdiction by a preponderance of the evidence once its existence is questioned by the defendant. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).  When a district court decides a pretrial personal jurisdiction dismissal motion without an evidentiary hearing, however, the plaintiff need prove only a prima facie case of personal jurisdiction.  *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993); *Combs*, 886 F.2d at 676.  In deciding whether the plaintiff has proved a prima facie case, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor.  *Combs*, 886 F.2d at 676; *Wolf v. Richmond Cnty Hosp. Auth.*, 745 F.2d 904, 908 (4th Cir. 1984), *cert. denied*, 474 U.S. 826 (1985).

6

B.   12(b)(6) and Rule 9(b)

Rule 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A 12(b)(6) motion tests the legal sufficiency of the complaint.  *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  A court reviewing a complaint on a 12(b)(6) motion must accept well-pleaded allegations as true and must construe factual allegations in favor of the plaintiff.  *See Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994).

A court must also be mindful of the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.  While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citation omitted).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff

7

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet this standard, *id.*, and a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. Moreover, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

Rule 9(b) imposes a heightened pleading standard for fraud claims. "In alleging fraud [], a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy the heightened pleading standard of Rule 9(b), a plaintiff must state with particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)), *rev'd on other grounds*, 131 S. Ct. 2296 (2011).

### III.   Analysis

A.   Alter-Ego Liability

Plaintiffs allege that Sonel provides faulty and dangerous electrical supply in Cameroon, which has caused damage to businesses, homes and in some cases, personal injury or death.  In seeking to hold AES responsible for Sonel's alleged conduct, Plaintiffs proceed on a theory of alter-ego liability. Plaintiffs aver that "there is such unity of interest and ownership among the AES Corporation and AES Sonel that the separate personalities of these entities no longer exist."  (SAC ¶ 14.)  AES argues that it should be dismissed from this action because none of Plaintiffs' alleged injuries are "plausibly traceable" to AES's conduct.  (Def. Mem. at 8.)  Defendants contend that Plaintiffs' allegations as to alter-ego liability merely parrot the legal standard and do not plausibly allege either "such unity" that "the separateness of the corporation has ceased" or that the corporate form has been misused to perpetrate a fraud.  (Def. Mem. at 10-11.)  The Court will dismiss AES from this action because the SAC fails to plausibly allege that any actions taken by Sonel in Cameroon are imputable to its parent company AES.

As a general matter, the United States Court of Appeals for the Fourth Circuit has "long recognized that a corporation is an entity, separate and distinct from its

9

officers and stockholders, and the individual stockholders are not responsible for the debts of the corporation." *Kinney Shoe Corp. v. Polan*, 939 F.2d 209, 211 (4th Cir. 1991). "[A] corporate entity is liable for the acts of a separate, related entity only under extraordinary circumstances, commonly referred to as 'piercing the corporate veil.'" *Vitol, S.A. v. Primerose Shipping Co. Ltd.*, 708 F.3d 527, 543 (4th Cir. 2013) (citations omitted). While the decision to pierce the corporate veil "must be taken reluctantly and cautiously, courts will not hesitate to take such action where justice so requires." *Id.* The corporate veil may be pierced where "the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *United States v. Bestfoods*, 524 U.S. 51, 63 (1998).

In Virginia, the party seeking to pierce the corporate veil bears the burden of proof. *See Buffalo Wings Factory, Inc. v. Mohd*, No. 1:07cv612, 2008 WL 4642163, at *6 (E.D. Va. Oct. 15, 2008). Virginia law provides that a court can pierce the corporate veil only upon showing that "(1) the corporation was the *alter ego*, alias, stooge, or dummy of the other entity; and (2) the corporation was a device or sham used to disguise wrongs, obscure fraud or conceal crime." *Informatics Applications Grp. Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 427 (E.D. Va. 2011). As Defendants note, Delaware law similarly

10

provides that to pierce the corporate veil on an alter ego theory, "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *IGEN Intern., Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 309 n.5 (4th Cir. 2003) (quoting *In re Sunstates Corp.,* 788 A.2d 530, 534 (Del. Ch. 2001)).[1]  The Court turns first to the question of whether Sonel was merely the alter ego of AES.  The Court will then consider whether the corporate form was used as a vehicle for fraud.

Alter ego liability may attach "where there is such unity between a corporation and an individual that the separateness of the corporation has ceased."  1 William Meade Fletcher*, Fletcher Cyclopedia of the Law of Corporations* § 41.10.  The Fourth Circuit has set forth several factors that "guide the determination of whether one entity constitutes the alter ego of another." *Vitol*, 708 F.3d at 544.  These factors include "gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities or maintain proper corporate records, non-functioning of officers, control

---

[1] As a general proposition, "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation." *United States v. Kolon Indus., Inc.,* 926 F. Supp. 2d 794, 814 (E.D. Va. 2013). Here, Sonel, a Cameroonian entity, is the relevant corporation.  Plaintiff has not, however, provided notice of intent to rely on foreign law and has briefed this matter in accordance with Virginia law.  Moreover, according to Defendants, the French Civil Code serves as the primary source of civil law in Cameroon.  Defendants state that French law is consistent with domestic law on piercing the corporate veil.  (Def. Mem. at 9 n.5.)

by a dominant stockholder and injustice or fundamental unfairness." *Id.*

Plaintiffs allege that there exists a unity of interest between Sonel and AES such that the "separate personalities of these entities no longer exist." (SAC ¶ 14.) Plaintiffs state that all of Sonel's "operations, strategic contacts, billing, organization, executive officers and the like, are ordered from AES in Virginia." (SAC ¶ 15.) Plaintiffs allege that Sonel in Cameroon is simply "executing instructions and directives and strategy emanating from USA based directors." (SAC ¶ 17.) By way of factual enhancement, Plaintiffs allege that "AES owns 56% of AES Sonel," (SAC ¶ 8), "AES is a holding company with no material assets other than the stock of its subsidiaries," (SAC ¶ 13), and AES's officers certified in a Form 10-K filed with the SEC that they are responsible for establishing and maintaining financial disclosure controls and procedures for AES's consolidated subsidiaries, (SAC ¶ 16). While Plaintiffs recite the legal standard for alter-ego liability, they do make any specific allegations concerning the dealings of AES and Sonel that would give rise to such liability. Instead, Plaintiffs' allegations are wholly consistent with the normal incidents of corporate ownership.

The Supreme Court has stated "it is hornbook law that the exercise of the control which stock ownership gives to the stockholders will not create liability beyond the assets of the subsidiary." *Bestfoods*, 524 U.S. at 60 (citations omitted). "That control" the Supreme Court continued, "includes the election of directors, the making by-laws and the doing of all other acts incident to the legal status of stockholders.  Nor will a duplication of some or all of the directors or executive officers be fatal." *Id.* (citations omitted).  The Court in *Bestfoods* further noted that in the context of parental oversight over a subsidiary's facility, "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions and articulation of general policies and procedures, should not give rise to direct liability." *Id.*  "Indeed, parents 'are almost always active participants in the affairs of an owned corporation . . . in the usual case, the exercise of such control over a subsidiary's actions in entirely permissible.'"  *S. Carolina Elec. & Gas Co. v. UGI Utils., Inc.*, No. 2:06cv2627-CWH, 2012 WL 1432543, at *60 n.21 (D.S.C. Apr. 11, 2012) (quoting *Esmark, Inc. v. NLRB*, 887 F.2d 739, 759 (7th Cir. 1989)).

Even accepting Plaintiffs' well-pled factual allegations as true, these facts suggest nothing more than the usual exercise of control to which stock ownership entitles a

parent company.  AES's ownership of the majority of Sonel's stock, and establishment and maintenance of financial disclosure procedures fall far short of any facts that would give rise to a plausible claim of alter-ego status.  Moreover, Plaintiffs' general allegations that Sonel "simply executes instructions, and directives and strategy emanating from AES" are devoid of any specific factual support.  These sweeping allegations do not contain the "'factual enhancement' necessary to cross 'the line between *possibility* and *plausibility* of entitlement to relief.'" *Vitol*, 708 F.3d at 548 (quoting *Twombly*, 550 U.S. at 557).

Likewise, Plaintiffs fail to plausibly allege that the corporate form was used as a vehicle for fraud.  *See S.E.C. v. Woolf*, 835 F. Supp. 2d 111, 124-125 (E.D. Va. 2011). Plaintiffs' SAC advances no allegations concerning fraud.  While Plaintiffs argue in their brief that AES is attempting to use the corporate form to "defeat public convenience" and protect Sonel's misconduct, Plaintiffs have not advanced any plausible factual allegations supporting such claims.  *Beale v. Kappa Alpha Order*, 192 Va. 382, 399 (1951).

B.   Personal Jurisdiction over Sonel

Sonel contends that it must be dismissed from this action because this Court does not have personal jurisdiction over it.  In Virginia, to establish jurisdiction over a non-resident, this Court must consider first whether jurisdiction is

14

authorized by Virginia law, and then whether the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment to the United States Constitution. *Consulting Eng'rs Corp. v. Geometric, Ltd*, 561 F.3d 273, 277 (4th Cir. 2009).  As Virginia's general long-arm statute extends personal jurisdiction to the fullest extent permitted by due process, the statutory inquiry merges with the constitutional inquiry.  *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002).  As a result, the Court need only undertake one inquiry to determine whether the exercise of jurisdiction here comports with the Fourteenth Amendment's due process requirements.

To satisfy the requirements of due process, a defendant must have sufficient "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).  To meet this minimum contacts test, a plaintiff must show that a defendant "'purposefully directed his activities at the residents of the forum' and the litigation results from alleged injuries that 'arise out of' those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985).  This test is designed to ensure that the defendant is not "haled into a jurisdiction solely as a result

of random, fortuitous, or attenuated contacts." *Consulting Eng'rs Corp.*, 561 F.3d at 277.

Two types of personal jurisdiction meet these constitutional requirements: specific jurisdiction and general jurisdiction.  In analyzing the due process requirements for asserting specific jurisdiction, the Fourth Circuit has set out a three part test in which the Court must consider, in order, (1) "the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State"; (2) "whether the plaintiffs' claims arise out of those activities directed at the State"; and (3) "whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp.*, 561 F.3d at 279 (*citing ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).  General jurisdiction exists for claims entirely distinct from the defendant's in-state activities where a defendant's activities in a state have been "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).  Defendants contend that because Plaintiffs' claims against Sonel stem entirely from alleged conduct and injury in Cameroon, specific jurisdiction is unavailable. (Def. Mem. at 12.)  Likewise, Defendants argue, general jurisdiction is impermissible because Sonel maintains no continuous or systematic business contacts with Virginia.  (Def.

16

Mem. at 12.)  Plaintiffs contend that Sonel does not have a "separate legal personality from AES" and that the relationship between Sonel and AES provides a basis for the exercise of both specific and general jurisdiction.  (Pl. Opp'n at 13.)

Turning first to specific jurisdiction, it is clear that the facts alleged will not support specific jurisdiction. Plaintiffs' claims against Sonel arise out of Sonel's activities in Cameroon.  (SAC ¶¶ 10, 11.)  The alleged power failures at issue and resulting injuries all occurred in Cameroon. Plaintiffs' claims do not stem from any activity Sonel directed at this forum.

Nor does AES's corporate presence in Virginia provide a basis for general jurisdiction over Sonel.  In *Goodyear Dunlop Tires Operations, S.A. v. Brown*, the Supreme Court addressed the question of general jurisdiction over the foreign subsidiaries of Goodyear USA, an Ohio corporation.  131 S. Ct. 2846 (2011). The Court explained, "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation it is an equivalent place, one in which the corporation is fairly regarded as at home."  131 S. Ct. at 2854 (citing Brilmayer et al., A Look at General Jurisdiction, 66 Texas L. Rev. 721, 728 (1988) (identifying domicile, place of incorporation and principal place of business as "paradig[m]" bases for the exercise of general

17

jurisdiction)).  The Court found that Goodyear USA's foreign subsidiaries, which had merely placed a product into the stream of commerce were "in no way at home in North Carolina" and could not be required to submit to the general jurisdiction of North Carolina courts.  *Id.; see Daimler AG v. Bauman*, 134 S. Ct. 746, 757 (2014).  Here, Plaintiffs make no allegations that Sonel itself is at home in Virginia or has had any contact with Virginia, much less "continuous and systematic" activities. *Helicopteros,* 466 U.S. at 415-16.  While Plaintiffs focus on Sonel's relationship to AES, merely having a domestic parent company is not itself a sufficient connection to the state to confer jurisdiction over a foreign subsidiary.  *See Goodyear*, 131 S. Ct. at 2857-58.

Additionally, Plaintiffs invoke an alter-ego theory, arguing that this Court's jurisdiction over AES encompasses Sonel as well.  In *Goodyear*, the Supreme Court noted, but did not address the question of piercing the corporate veil for jurisdictional purposes.  *Goodyear*, 131 S. Ct. at 2857.  The Court did, however, point to the relevant authority: "the issue of jurisdictional merger is comparable to the corporate law question of piercing the corporate veil."  Brilmayer & Paisley, Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency, 74 Cal. L. Rev. 1, 14, 29-30 (1986).  As previously discussed, Plaintiffs fail to

plausibly allege that Sonel is the mere alter ego of AES such that the corporate form should be disregarded.   Accordingly, this Court has no basis for exercising jurisdiction over Sonel.

C.   ATS Claim

Even if this Court were to find that it could impute Sonel's actions to AES and that the Court has jurisdiction over Sonel, Plaintiffs are not entitled to relief brought under the ATS.   Count 1 of Plaintiffs' SAC alleges cruel, inhuman, or degrading treatment actionable under the ATS.   (SAC ¶¶ 93-99.) Defendants argue that this claim fails for three reasons: (1) providing unreliable power supply does not violate an accepted norm of international law; (2) the ATS does not apply extraterritorially; and (3) the ATS does not impose liability on corporations.

The ATS is a jurisdictional statute, providing that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."   28 U.S.C. § 1350.   The ATS provides the district court with jurisdiction to hear certain claims.   It does not expressly provide any causes of action.   *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1663 (2013).   Congress enacted the ATS in response to "violations of international law committed within the United States against foreign ambassadors."   *Al Shimari v.*

19

*CACI Intern., Inc.*, 951 F. Supp. 2d 857, 863 (E.D. Va. 2013).
In *Sosa v. Alverez-Machain*, 542 U.S. 692 (2004), the Supreme
Court explained that at the time the ATS was enacted, the "three
principal offenses against the law of nations" were "violation
of safe conducts, infringement of the rights of ambassadors, and
piracy." *Kiobel*, 133 S. Ct. at 1666 (quoting *Sosa*, 542 U.S. at
723-24.)  Therefore, federal courts "should not recognize
private claims under federal common law for violations of any
international law norm with less definite content and acceptance
among civilized nations than the historical paradigms familiar
when [the ATS] was enacted."  *Id.* (quoting *Sosa*, 542 U.S. at
732.)

It is generally accepted that the ATS provides
jurisdiction over cases "involving various forms of official or
state sponsored torture, genocide, war crimes, crimes against
humanity, as well as forced labor, servitude or slavery."  14A
The Late Charles Alan Wright & Arthur R. Miller, *Fed. Prac. &
Proc. Juris.* § 3661.2 (4th ed. 2014).  Federal courts have also
exercised jurisdiction over ATS cases involving "cruel, inhuman
or degrading treatment, violations of diplomatic immunity, many
instances of racial discrimination, extrajudicial killings,
nonconsensual medical experimentation on humans, sexual assault
against minors, arbitrary arrest and detention and arbitrary
denationalization."  *Id.*

20

Plaintiffs allege that Defendants' provision of substandard electrical supply and the attendant injuries suffered by Plaintiffs constitute cruel, inhuman or degrading treatment actionable under the ATS. (SAC ¶ 95.) Plaintiffs argue that "electricity, as a form of sustainable development is a basic human need in the modern world." (Pl. Opp'n at 18.) As Defendants correctly contend, however, their alleged failure to supply electrical services in a safe or consistent manner is simply not a violation of a "specific, universal, and obligatory" norm of international law. *Sosa*, 124 S. Ct. at 732. Plaintiffs do not point to any cases – and the Court's own research reveals none – where a court imposed liability under the ATS for substandard utility supply. Plaintiffs, apparently recognizing this limitation, have pleaded their claim as an alleged violation of the recognized norm against "cruel, inhuman or degrading treatment." This norm, however, does not encompass the acts alleged here.

As a general matter, "[t]he prohibition of cruel, inhuman and degrading treatment has been widely recognized in numerous sources of international law." *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1092 (N.D. Cal. 2008). The court in *Bowoto* set forth a spectrum along which those cases that have recognized the prohibition of cruel, inhuman and degrading treatment fall. On one end, a court found that this norm was

21

actionable under the ATS where plaintiffs "witness the torture or severe mistreatment of an immediate relative; watch soldiers ransack their home and threaten their family; or have a grenade thrown at them." *Id.* (quoting *Xuncax v. Gramajo*, 886 F. Supp. 162, 187 (D. Mass. 2008)).  On the other end of the spectrum, the court in *Doe v. Qi* found that "incarceration for one day and being pushed, shoved, hit and placed in a choke-hold are not severe enough to uphold a claim of cruel, inhuman or degrading treatment under the ATS." *Id.* (quoting *Doe v. Qi*, 349 F. Supp. 2d, 1258, 1325 (N.D. Cal. 2004)).  The alleged power failures and attendant injury here fall nowhere near the types of injuries found actionable as violations of a norm against cruel, inhuman or degrading treatment.  Plaintiffs do not allege the type of intentional, targeted persecution present in other cases that invoke this norm.  At best, Plaintiffs' claim is that Defendants' provision of substandard electrical supply impedes their ability to live their daily lives comfortably and safely. This is no small matter.  The gravity of the resulting injury to Plaintiffs, however, does not transform Defendants' alleged acts or inaction into the type of malicious, intentional conduct actionable under recognized norms of international law.

Moreover, recognition of the norm regulating reliable electrical services sought by Plaintiffs would be inadvisable for policy reasons.  In *Kiobel,* the Supreme Court cautioned

against the recognition of new norms of international law.  The Court stated, "[s]ince many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution." *Kiobel*, 133 S. Ct. at 1664 (quoting *Sosa*, 542 U.S. at 727).  In *Sosa*, the Court directed courts to "consider carefully the 'practical consequences of making [a] cause of action available to litigants in the federal courts.'" *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 579 (E.D. Va. 2009) (quoting *Sosa*, 542 U.S. at 732-33).  Defendants argue that recognizing Plaintiffs' cause of action would "effectively transform the U.S. federal courts in to a global utilities tribunal." (Def. Mem. at 17.)  The Court agrees that the potential consequences allowing a cause of action under the ATS on a substandard electrical supply theory may have both serious and unforeseen results.  Recognition of a cause of action under the ATS for the provision of regular utilities services in foreign countries would be extremely meddlesome.  Therefore, because it would be both unprecedented and imprudent to do so, the Court will not recognize Plaintiffs' cause of action under the ATS.

Plaintiffs' failure to identify a "specific, universal and obligatory" norm of international law is fatal to their claim under the ATS.  *Sosa,* 542 U.S. at 733.  The Court will

nevertheless briefly address the additional questions of extraterritoriality and corporate liability.

In 2013, the Supreme Court first addressed the issue of the ATS's extraterritorial application in *Kiobel*.  In *Kiobel*, Nigerian nationals in the United States filed suit under the ATS alleging that certain Dutch, British and Nigerian corporations aided and abetted the Nigerian government in committing violations of the law of nations.  *Kiobel*, 133 S. Ct. at 1662. The Second Circuit dismissed the complaint in its entirety, finding that "the law of nations does not recognize corporate liability."  *Id.* at 1663.  After oral argument, the Supreme Court directed the parties to file supplemental briefs addressing the question of whether the "ATS confers jurisdiction over claims arising from tortious acts occurring abroad."  *Al Shimari*, 951 F. Supp. 2d at 864.

The Court in *Kiobel* found "that the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption."  *Kiobel*, 133 S. Ct. at 1669.  The Court explained that "[o]n these facts, all the relevant conduct took place outside the United States." *Id*.  Moreover, "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application."  *Id*.  "Corporations are often present in many

24

countries, and it would reach too far to say that mere corporate presence suffices." *Id.*

Post-*Kiobel*, "some courts have dismissed ATS claims for alleging purely extraterritorial conduct." *Du Daobin v. Cisco Sys. Inc.,* No. 11-1538, 2014 WL 769095, at *9 (D. Md. Feb. 24, 2014) (citing *Balintulo v. Daimler AG,* 727 F.3d 174 (2d Cir. 2013) (dismissing ATS claims brought against South African subsidiary companies for aiding and abetting violations of international law committed by the South African government); *Chen Gang v. Zhao Zhizhen,* No. 3:04-CV-1146-RNC, 2013 WL 5313411 (D. Conn. Sept. 20, 2013) (dismissing ATS action as a "paradigmatic 'foreigncubed' case" where the parties were present in China and the alleged violations of international law all took place in China) (collecting cases); *Al Shimari v. CACI Intern., Inc.,* 951 F. Supp. 2d at 858 (dismissing ATS claims where "the acts giving rise to their tort claims occurred exclusively in Iraq, a foreign sovereign")); *Chowdhury v. Worldtel Bangladesh Holding, Ltd.,* 746 F.3d 42, 49 (2d Cir. 2014) (dismissing ATS claims where "all the relevant conduct set forth in plaintiff's complaint occurred in Bangladesh").

The present case fits comfortably within the realm of cases dismissed for alleging purely extraterritorial conduct. As in *Al Shimari*, the alleged acts giving rise to Plaintiffs' claims "occurred exclusively on foreign soil." *Al Shimari*, 951

25

F. Supp. 2d at 866.  Plaintiffs attempt avoid *Kiobel* by pleading that "AES Corporation is a U.S. Corporation and 'corporate presence' in the United States is sufficient for a claim to 'touch and concern' the United States" where the corporation profits from and is actively involved in the decision-making of its foreign subsidiaries.  (SAC ¶ 12.)  The Supreme Court, however, has stated just the opposite – "it would reach too far to say that mere corporate presence suffices." *Kiobel*, 133 S. Ct. at 1670.  Plaintiffs' allegations that AES profits from and directs the decision-making process of Sonel – mere incidents of shareholder status – do not "touch and concern the territory of the United States" with "sufficient force to displace the presumption against extraterritorial application." *Kiobel*, 133 S. Ct. at 1669.

Finally, Defendants argue that corporate liability is impermissible under the ATS.  Defendants, citing to the Second Circuit in *Kiobel*, assert that corporate liability is not a recognized norm of customary international law. *Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111, 149 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct. 1659 (2013).  Plaintiffs cite to several pre-*Kiobel* cases that recognized corporate liability under the ATS. *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011), *vacated*, 527 F. App'x 7, 7 (D.C. Cir. 2013); *Sarei v. Rio Tinto PLC*, 671 F.3d 736, 761 (9th Cir. 2011) (en

banc), *cert. granted and judgment vacated*, 133 S. Ct. 1995 (2013) (vacating on the basis of *Kiobel*), *dismissed on remand*, 722 F.3d 1109 (9th Cir. 2013) (affirming the district court's dismissal with prejudice); *Flomo v. Firestone Natural Rubber Co.*, 643 F.3d 1013, 1021 (7th Cir. 2011).  Plaintiffs further note that the Supreme Court in *Kiobel* appeared to contemplate the possibility of corporate liability.  *Kiobel*, 133 S. Ct. at 1669 ("Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices.").  The Fourth Circuit has not addressed this issue.

Post-*Kiobel*, several courts have found that corporations may be held liable under the ATS.  *See Doe I v. Nestle USA, Inc.*, 738 F.3d 1048, 1049 (9th Cir. 2013); *In re South African Apartheid Litig.*, No. 02 MDL 1499, 2014 WL 1569423, at *6-9 (S.D.N.Y. Apr. 17, 2014).  Defendants ask the Court to find that corporate liability is not an international norm under *Sosa*.  (Def. Mem. at 20.)  Given the Supreme Court's statements, albeit in dicta, in *Kiobel* and the reasoning of other courts, both pre and post-*Kiobel*, the Court is not convinced that Defendants are correct.  As this Court has explained, "[n]othing in the ATS or *Sosa* may plausibly be read to distinguish between private individuals and corporations; indeed, *Sosa* simply refers to both individuals and entities as 'private actors.'"  *In re XE Services Alien Tort Litig.*, 665 F.

Supp. 2d at 588.   Therefore, the Court in *In re XE Services* found that "claims alleging direct corporate liability for war crimes are cognizable under the ATS."  *Id.*  This Court sees no principled basis for concluding that alleged violations of an international norm against cruel, inhuman and degrading treatment should be treated any differently than liability for war crimes.  Accordingly, while Plaintiffs' ATS claim fails on other grounds, AES and Sonel are not categorically immune under the ATS merely because of their corporate status.

      D.    <u>Common Law Claims</u>

          1.   <u>Breach of Contract</u>

      Count two of the SAC alleges breach of a third-party contract.  (SAC ¶¶ 100-112.)  Plaintiffs allege that in 2001, Defendants entered into a written contract with the government of Cameroon, in which Defendants "agreed to supply reliable power supply" in Cameroon.  (SAC ¶ 101.)  Plaintiffs allege that the parties entered this contract for the benefit of "consumers of electrical power in Cameroon in general, of which plaintiffs form the group."  (SAC ¶ 102.)  Plaintiffs allege that Defendants breached this contract by failing to provide reliable electrical supply in Cameroon.  (SAC ¶ 104.)  Defendants argue that this claim must be dismissed because Plaintiffs fail to plausibly allege that they are intended third-party

beneficiaries of a contract to which AES or Sonel is a party. (Def. Mem. at 20.)

A third-party beneficiary's right to assert a claim arising from a contract is conferred by statute in Virginia. Section 55-2 of the Virginia Code provides, in relevant part, that:

> [I]f a covenant or promise be made for the benefit, in whole or in part, or a person with whom it is not made, or with whom it is made jointly with others, such person, whether named in the instrument or not, may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration has moved from him to the party making such covenant or promise.

Va. Code Ann. § 55-2 (2013).  In determining whether a contract is made for the benefit of a third-party, the Virginia Supreme Court distinguishes between incidental and intended third-party beneficiaries.  *Kelly Health Care, Inc. v. Prudential Ins. Co. of Am. Inc.,* 226 Va. 376, 380 (1983).  A third-party does not have standing unless "the parties to the contract clearly and definitely intended it to confer a benefit upon him."  *Id.* (quoting *Professional Realty v. Bender*, 216 Va. 737, 739 (1976)).  A potential or incidental beneficiary of a contract has no standing to sue.  *Id.*  Moreover, "it is not enough that the third-party is 'only one member of a large class' of possible beneficiaries under the contract."  *Bosworth v. Vornado*

*Realty L.P.*, No. CL-2010-11031, 2010 WL 8925838, at *9 (Va. Cir. Ct. Dec. 20, 2010) (citing *Kelly Health Care*, 226 Va. at 380). "Rather, the third-party must be specifically envisioned in the contract." *Id.*

In this case, Plaintiffs allege that Defendants entered into a written contract with the government of Cameroon to provide "reliable power supply" to the country. (SAC ¶ 101.) Plaintiffs aver that "this contract was entered into for the benefits of Cameroon people, including Plaintiffs." (SAC ¶¶ 101, 102) Plaintiffs do not have a copy of the alleged contract or know any of the specific language therein.

Drawing all reasonable inferences in Plaintiffs' favor, these allegations are nevertheless insufficient to support a finding that Plaintiffs are the intended beneficiaries of any contract between AES, Sonel and the government of Cameroon. Plaintiffs' SAC alleges only that in 2001 AES and the government of Cameroon entered into a contract intending "to benefit consumers of electrical power in Cameroon in general, of which Plaintiffs form the group." (SAC ¶ 102.) Plaintiffs do not allege that the parties to the contract "clearly and definitely" intended to confer a benefit on them individually. Instead, the SAC specifically states that the contract was formed to benefit consumers "in general."

Plaintiffs lack standing as they are at best the "potential and incidental beneficiar[ies] of a contract intended to benefit a much larger and diffuse class." *Bosworth*, 2010 WL 8925838, at *10 ("Plaintiff has standing *only* if the contract clearly and definitely intended to confer a benefit on Mrs. Bosworth"); *Kelly Health Care*, 226 Va. at 380 (finding that plaintiff did not have standing to sue as third party beneficiary where it was "only one member of a health care providers" and therefore a "potential and incidental, and never the intended, beneficiary of the contract"). Plaintiffs are, at best, members of a large class of consumers of electricity within Cameroon.[2]

Moreover, while Plaintiffs allege the existence of a written contract between AES, Sonel and the government of Cameroon, the SAC contains no plausible factual allegations about the alleged contract's contents. Plaintiffs have not provided the Court with any facts about the text of the contract itself tending to nudge its third-party beneficiary claims over the line from possible to plausible.

---

[2] Moreover, the Restatement (Second) of Contracts supports the view taken by Virginia courts. The Restatement explains, "[g]overnment contracts often benefit the public, but individuals members of the public are treated as incidental beneficiaries unless a different intention is manifested." Restatement (Second) of Contracts § 313 cmt. a (1981). Plaintiffs' pleading is devoid of any facts indicating that the intention of the alleged contract between AES, Sonel and the government of Cameroon was other than to benefit the public at large.

2.   <u>Negligence Claims</u>

Counts five and six of the SAC allege negligent infliction of emotional distress, (SAC ¶¶ 118-124), negligence and negligence per se, (SAC ¶¶ 125-129).  Defendants argue that Plaintiffs' negligence claims all fail to allege any cognizable duty running from AES to Plaintiffs under Virginia law, or from Sonel to Plaintiffs.  (Def. Mem. at 23.)

a.   <u>Negligent infliction of emotional distress</u>

"As an initial matter, there can be no actionable negligence unless there is a legal duty, a violation of the duty, and a consequent injury."  *Robertson v. Prince William Hosp.*, No. 1:11cv820, 2012 WL 1448101, at *5 (E.D. Va. Apr. 25, 2012) (quoting *Villnow v. DeAngelis*, 55 Va. Cir. 324, 225 (Va. Cir. Ct. 2001)).  To state a claim for negligent infliction of emotional distress ("NIED"), a plaintiff must "properly plead and prove[] by clear and convincing evidence that his [or her] physical injury was the natural result of fright or shock proximately caused by the defendant's negligence."  *Lucas v. Henrico Cnty Sch. Bd.*, 822 F. Supp. 2d 589, 609 (E.D. Va. 2011) (quoting *Delk v. Columbia / HCA Healthcare Corp.*, 259 Va. 125, 137 (2000)).  Defendants argue that Plaintiffs fail to allege any duty running from AES or Sonel to Plaintiffs.  (Def. Mem. at 23.)  Defendants further contend that Plaintiffs fail to allege

32

the required physical symptoms.  (Def. Mem. at 25.)  Plaintiffs

do not address this claim in their opposition brief.

      The Court agrees that Plaintiffs' NIED claim fails

to sufficiently allege the required element of physical injury.

While the SAC states that Plaintiffs suffered "emotional and

physical distress," Plaintiffs' allegation is a mere recitation

of the legal standard, devoid of any factual support.  (SAC ¶

122.)  Moreover, many of the Plaintiffs are "business groups"

who are not alleged to have suffered any physical injury and

instead sustained only economic losses.  (SAC ¶¶ 44-48.)  The

SAC does not specifically relate which Plaintiffs allegedly

suffered physical injury and which sustained merely economic

loss.  Accordingly, Plaintiffs' NIED claim will be dismissed.

      b.   Negligence *per se*

      Under Virginia law, to state a claim of negligence *per

se*, a plaintiff must allege: (1) that the defendant violated a

statute enacted for public safety; (2) that the plaintiff

belongs to the class of persons for whose benefit the statute

was enacted, and that the harm that occurred was of the type

against which the statute was designed to protect; and (3) that

the statutory violation is a proximate cause of the plaintiff's

injury.  *Kaltman v. All Am. Pest Control, Inc.*, 281 Va. 483, 496

(2011).  Plaintiffs allege that Defendants' conduct constitutes

negligence *per se* because the "uncontrolled and unreliable power

33

supply to the dwellings and business units in Cameroon" violates "numerous Federal statutes." (SAC ¶ 128.)  Plaintiffs do not, however, identify any statute that imposes a duty of care on AES and Sonel.  Likewise, Plaintiffs do not allege that they belong to a class of persons for whose benefit any such federal statute was enacted.  In their opposition brief, Plaintiffs contend that they "can arguably be in the class of persons that a safety statute was trying to protect." (Pl. Opp'n at 23.)  Plaintiffs' failure to identify an actual, rather than merely hypothetical, safety statute designed to protect against the types of harm suffered here, renders the claim of negligence *per se* a nonstarter.

### c.   Ordinary negligence

In Virginia, a claim for negligence must include allegations that: (1) a legal duty was owed by the Defendant; (2) that duty was breached by the Defendant; and (3) a harm or injury was proximately caused by the breach. *Tohotcheu v. Harris Teeter, Inc.*, No. 1:11-CV-767, 2011 WL 5873074, at *4 (E.D. Va. Nov. 22, 2011).  Defendants argue that Plaintiffs fail to allege any duty running from AES or Sonel to Plaintiffs independent of the alleged contractual relationship. (Def. Mem. at 23.)

As to AES, the Court agrees.  Plaintiffs fail to allege any common law duty running from AES – a holding company

- to Plaintiffs.  Plaintiffs' SAC appears to allege a theory of "negligent hiring, training supervision and/or retention." (SAC ¶ 127.)  Plaintiffs, however, "fail[] to specify what actions of Defendant constituted a breach of the legal duty to hire suitable employees." *Morgan v. Wal-Mart Stores E., LP*, No. 3:10CV669-HEH, 2010 WL 4394096, at *3 (E.D. Va. Nov. 1, 2010).

However, the Court disagrees with Defendants' assertion that Plaintiffs fail to allege a cognizable duty on the part of Sonel.  Sonel is an electricity distributor.  As such, it has a common law duty to exercise "a care commensurate with the danger of the instrumentality." *Jeffress v. Va. Ry. & P. Co.*, 127 Va. 694, 714 (1920).  Evaluating the SAC as a whole, in the light most favorable to Plaintiffs, some of the Plaintiffs have advanced plausible factual allegations that Sonel breached its duty to use due care in providing electrical services.  Many of the Plaintiffs allege only economic losses.  These Plaintiffs fail to state a claim for negligence.  *See Am. Online, Inc. v. St. Paul Mercury Ins. Co.,* 207 F. Supp. 2d 459, 470 (E.D. Va. 2002) *aff'd,* 347 F.3d 89 (4th Cir. 2003) ("The economic loss rule generally bars claims in tort for economic losses, limiting recovery for such losses to the law of contract.").  The Plaintiffs alleging property damage, however, do appear to state a claim for negligence against Sonel, albeit one over which this Court does not have jurisdiction.

35

3.   Intentional Infliction of Emotional Distress

Count four of the SAC alleges intentional infliction of emotional distress ("IIED"). (SAC ¶¶ 113-117.) To succeed on an IIED claim in Virginia, a plaintiff must allege, and then prove by clear and convincing evidence that: (1) "the wrongdoer's conduct is intentional or reckless"; (2) "the conduct is outrageous and intolerable"; (3) "the alleged wrongful conduct and emotional distress are causally connected"; and (4) "the distress is severe." *Russo v. White*, 241 Va. 23, 26 (1991). This cause of action is generally disfavored. *Almy v. Grisham*, 273 Va. 68, 81 (2007). Specifically, liability for IIED has been found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Russo*, 241 Va. at 27. Liability for IIED "does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities." *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir. 1987). Instead, it "arises only when the emotional distress is extreme, and where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo*, 241 Va. at 27.

Defendants contend that Plaintiffs merely parrot the legal standard for IIED without alleging any facts to support

such a claim.  (Def. Mem. at 26.)  In their opposition, Plaintiffs reiterate that the power failures at issue have caused "economic damage, deprivation of basic human rights, and the loss of human life." (Pl. Opp'n at 24.)  Plaintiffs do not directly address the claimed shortcomings in their SAC, and instead argue that the Court must permit discovery to allow them the opportunity to prove that "these power failures were a direct result of the Defendants' reckless and negligent conduct." (Pl. Opp'n at 24.)

Plaintiffs' IIED claim fails, because, among other reasons, the SAC fails to sufficiently allege the element of intent.  "The first element is satisfied where the defendant had the specific purpose of inflicting emotional distress or where the specific conduct was intended and the actor knew or should have known that emotional distress would likely result." *Dixon v. Denny's, Inc.*, 957 F. Supp. 792, 796 (E.D. Va. 1996). Plaintiffs fail to allege any facts supporting a theory that Defendants acted with the specific purpose of causing Plaintiffs emotional distress or that Defendants' alleged conduct was intended.

### 4.  Misrepresentation Claims

Counts nine (SAC ¶¶ 140-144) and ten (SAC ¶¶ 145-149) of the SAC allege negligent misrepresentation and intentional misrepresentation respectively.  At the outset, the Court notes

that these claims as labeled are not actionable under Virginia law. *See Baker v. Elam*, 883 F. Supp. 2d 576, 581 (E. D. Va. 2012) ("Virginia courts . . . do not recognize negligent misrepresentation as a separate cause of action from that of constructive fraud"); *Skyes v. Bayer Pharmaceuticals Corp.*, 548 F. Supp. 2d 208, 216-217 (E.D. Va. 2008) ("In Virginia, intentionally making a false representation is an element of a claim for 'actual fraud'").  The Court will therefore construe counts nine and ten as claims for constructive fraud and actual fraud.

To state a claim of actual fraud a Plaintiff must demonstrate: (1) a false representation by the defendant, (2) of a material fact, (3) made intentionally, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.  *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 219 (2005).  "Constructive fraud consists of the same elements; however 'the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently.'"  *Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey & Co., Inc.*, 191 F. Supp. 2d 652, 662 (E.D. Va. 2002) (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999)).

To plead fraud, a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil

Procedure.  Under Rule 9(b), claims alleging fraud are subjected to a heightened pleading standard, which requires the plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  A plaintiff claiming fraud must allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009)).  "[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 n.5 (4th Cir. 1999).

Defendants argue that Plaintiffs' allegations fail to plead fraud with particularity.  (Def. Mem. at 27.)  Defendants contend that Plaintiffs fail to state the time, place and contents of the false representation and that any statements concerning Sonel's "major successes in the provision, supply, and distribution of electrical power" are non-actionable puffery.  (Def. Mem. at 28.)  Plaintiffs do not address either fraud claim in their opposition brief.

The Court agrees that Plaintiffs actual and constructive fraud claims – to the extent that Plaintiffs have not abandoned such claims – must be dismissed.  Even assuming

Plaintiffs have sufficiently alleged false representations by Defendants, the SAC is devoid of factual allegations concerning Plaintiffs' reliance.  Plaintiffs state only that Defendants' statements "would induce justifiable reliance."  (SAC ¶ 144.)

     5.   <u>Loss of Consortium and Wrongful Death Claims</u>

Certain plaintiffs (Nyah Tchami William, Nana Bamen Ngnangna Eugenie, Mendefo Youmeni Jean Jules, and Madame Mendefo Fridoline) seek relief for harm suffered as a result of death or injury to their children.  Plaintiffs seek damages for wrongful death, (Compl. ¶¶ 109-112), and loss of consortium, (Compl. ¶¶ 136-139).

Virginia no longer recognizes a loss of consortium cause of action.  The Fourth Circuit has "held that loss of consortium is not recoverable in the Commonwealth of Virginia." *Torabipour v. Cosi, Inc.*, No. 1:11cv1392, 2012 WL 2153168, at *7 (E.D. Va. June 12, 2012) (citing *Carey v. Foster*, 345 F.2d 772 (4th Cir. 1965)).  Plaintiffs do not address this issue in their opposition brief, nor do they attempt to invoke the law of another jurisdiction.  Accordingly, the Court will dismiss Plaintiffs' loss of consortium claim.

Virginia law requires that a wrongful death action be brought "by and in the name of the personal representative" of the decedent.  Va. Code Ann. § 8.01-50.  Defendants argue that Plaintiffs' wrongful death claim fails because the SAC does not

allege that Plaintiffs are the qualified personal representatives of the decedents.  Plaintiffs contend that they are the parents of the decedents and are acting as their personal representatives.  (Pl. Opp'n at 25.)

Contrary to Plaintiffs' apparent understanding, "personal representative" is a legal role, not a status one can assume without properly qualifying.  Moreover, Plaintiffs' SAC does not actually allege that Plaintiffs are acting as their deceased family members' personal representatives.  Accordingly, Plaintiffs lack standing to pursue a wrongful death action.  *See Bradley v. Johnson & Johnson*, No. 1:12CV92, 2012 WL 1957812, at *2 (E.D. Va. May 30, 2012) (holding that plaintiff lacked standing where he failed to demonstrate that he had been properly qualified as a personal representative of decedent's estate); *Hall v. Bon Secours,* No. 3:06cv678, 2007 WL 295619, at *2 (E.D. Va. Jan. 29, 2007) (holding that plaintiff lacked standing where he failed to demonstrate that he was the personal representative of the decedent's estate); *Johnston Mem'l Hosp. v. Bazemore,* 277 Va. 308, 313 (Va. 2009) ("Since only the personal representative of a decedent's estate may bring an action for wrongful death and the named plaintiff in this action was not a legal entity at the time the action was filed, the complaint had no legal effect, as the named plaintiff lacked

legal standing to file the action." (internal citation omitted)).

### 6.   Civil Conspiracy

Under Virginia law, the elements of a common law civil conspiracy are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff. *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007). A claim for civil conspiracy "requires proof that the underlying tort was committed." *Beasley v. FV-I, Inc.,* No. 1:13cv116, 2013 WL 1192018, at *4 (E.D. Va. Mar. 21, 2013) (citations omitted). Where a plaintiff has no actionable claim for the underlying alleged wrong, an action for conspiracy based on that wrong will not lie. *Id.*

To withstand a motion to dismiss, a plaintiff must "plead the requisite concert of action and unity of purpose in more than mere conclusory language." *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC,* 261 F. Supp. 2d 483, 499–500 (E.D. Va. 2003). Virginia requires a plaintiff to allege "some details of time and place and the alleged effect of the conspiracy." *Beasley*, 2013 WL 1192018, at *4. "Where there are only vague, conclusory allegations of conspiracy, the claim fails at the threshold." *Id.*

42

Plaintiffs fail to state an actionable claim for any underlying tort other than ordinary negligence.  Thus, Plaintiffs' civil conspiracy claim fails.  *See Witcher v. Reid*, No. CH05-1974, 2006 WL 1494675, *4 (Va. Cir. Ct. May 31, 2006) ("Because negligence by definition is not an intentional wrong, one cannot agree or conspire to be negligent.")  Moreover, Plaintiffs' complaint contains only vague, conclusory allegations of conspiracy that fail to withstand a motion to dismiss.  Plaintiffs allege that "Defendants knowingly and willfully conspired and agreed among themselves to engage in supplying unreliable electric power in Cameroon, in violation of the rights of Plaintiffs."  (SAC ¶ 131.)  The SAC does not identify or detail any agreement between AES and Sonel. Moreover, Plaintiffs' opposition brief does not address their civil conspiracy claim.  Accordingly, the Court will dismiss this claim.

> E.   Dismissal with Prejudice

Plaintiffs seek leave to amend their complaint to correct any deficiencies and to allege additional facts in support of their theories of liability.  (Pl. Opp'n at 25.)  A party may amend its pleading once as a matter of course, but after the first amendment, the party must obtain written consent from the opposing party or leave of the court.  Fed. R. Civ. P. 15(a)(1).  Rule 15 of the Federal Rules of Civil Procedure

directs that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2).  The liberality of the rule "gives effect to the federal policy in favor of resolving cases in their merits instead of disposing of them on technicalities." *Laber v. Harvey,* 438 F.3d 404, 426 (4th Cir. 2006) (*citing Conley v. Gibson,* 355 U.S. 41, 48 (1957)). Nevertheless, "leave to amend need not be given where amendment would be futile." *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 391 (4th Cir. 2005); *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008) (affirming dismissal with prejudice where "amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability").

The Court will dismiss Plaintiffs' claims against AES with prejudice.  Plaintiffs have already twice amended their complaint.  In light of the fundamental deficiencies in Plaintiffs' theories of liability, further amendment would be futile.  Plaintiffs' ATS claim, at its core, asks the Court to recognize an international norm of safe and reliable power supply.  Substandard power supply falls well outside the bounds of universally recognized norms of international law.  Further amendment cannot correct the fundamental flaws in Plaintiffs' theory of liability under the ATS.  Likewise, Plaintiffs' state law claims cannot be cured through further amendment, especially given the SAC's failure to allege sufficient factual matter

suggesting that Sonel's actions in Cameroon can be imputed to AES.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss.

An appropriate Order will issue.

_____/s/_____
June 26, 2014                  James C. Cacheris
Alexandria, Virginia       UNITED STATES DISTRICT COURT JUDGE